**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| **v.** | Case No. 1:21-cr-120-RCL |
| **SCOTT KEVIN FAIRLAMB**, | |
| *Defendant*. | |

## MEMORANDUM OPINION

On January 6, 2021, a mob stormed and breached the United States Capitol.  Videos and photographs from that event show defendant Scott Fairlamb assaulting a police officer, entering the Capitol, and carrying a dangerous weapon.  A grand jury indicted the defendant on twelve counts, including charges of assault on a federal officer, armed unlawful entry, and armed disorderly conduct.

Although a magistrate judge ordered the defendant released pending trial, the government sought review of the release order.  ECF No. 7.  Chief Judge Beryl A. Howell stayed release pending review.  *See* Order, ECF No. 5.  Because the Court finds that the defendant's proposed conditions of release will not reasonably assure the safety of the community if it releases the defendant pending trial, it will **GRANT** the government's motion and **ORDER** the defendant detained.

## I.   BACKGROUND

### A.  Factual Background

On January 6, 2021, the Senate and House of Representatives assembled in joint session to count electoral votes cast in the 2020 Presidential Election.  To prevent Congress from certifying the results, a mob of rioters stormed the Capitol.  The defendant was part of that mob.  Gov't Mem. 5, ECF No. 18.

1

That morning, the defendant posted on Facebook, "How far are you willing to go to defend our Constitution?   Made the trip solo, looking to meet my fellow Patriots who share the same beliefs.  Put up or shut up."  *Id.* at 16.  The days events would show that the defendant was ready to "put up."

Early in the afternoon, the defendant climbed scaffolding on the western face of the Capitol and screamed, "we ain't fucking leavin'!"  Gov't Ex. 2; *see also* Gov't Ex.1. Government Exhibit 4—a video the defendant took of himself during the riot and posted to his Instagram page—and Government Exhibit 1—a still from a Youtube video—depicts that moment.



Gov't Exs. 1 (cropped), 4.  Exhibit 4 shows, the defendant appeared particularly agitated during the events of January 6.  Even among other rioters, the defendant's aggression stood out.

Later, the defendant—as part of a large group—crossed overturned police barricades a mere eighteen seconds after other rioters had broken through the line.  Gov't Mem. 7–8; Gov't Exs. 5–7.  As he crossed those barricades, the defendant picked up a baton.  Gov't Exs. 5–7.  A

video the defendant posted to his Facebook page shows him carrying the baton and shouting, "What [do] patriots do?  We fucking disarm them and then we storm the fucking Capitol!  Fuck you!"  Gov't Ex. 8–9.  A still from that video shows the defendant waving the baton and Government Exhibit 10 shows him carrying it fully extended into the Capitol building.

 

Still from Ex. 8; Gov't Ex. 10 (cropped).

The defendant brought that baton into the Capitol building.  Gov't Ex. 10.  He was one of the first to enter the Senate side of the Capitol after other rioters had broken a window and kicked down a door.  Detention Hr'g (proffer by government counsel).  He was then, apparently, forced out of the building by chemical agents.  Gov't Mem. 10; Gov't Ex. 11.

Around thirty minutes after he left the building, the defendant encountered Metropolitan Police Department officers at the west front of the Capitol.  The officers were outnumbered by rioters and proceeding in a defensive formation to a safer location.  Detention Hr'g (proffer by government counsel).  The defendant followed the line of police officers.  Gov't Mem. 10–11;

Gov't Ex. 12.[1]  He shouted aggressively at the officers "Are you an American?  Act like one! . . .  You guys have no idea what the fuck you're doing!"  Gov't Mem. 10–11; Gov't Ex. 12–13.  Government Exhibit 13 shows that confrontation.



Gov't Ex. 13 (cropped).

The defendant then wheeled around, cutting Officer Z.B. off from the formation.  Gov't Ex. 12.  Officer Z.B. tried to sidestep him.  *Id.*  The defendant shouted, "Don't touch me bro!  I need my space!", lunged towards Officer Z.B., and shoved him hard enough to make him stumble into nearby rioters.  Gov't Mem. 11; Gov't Ex. 12, 15.

Officer Z.B. then regained his footing and tried to swat the defendant's hand away.  Gov't Mem. 11; Gov't Ex. 12.  The defendant responded by punching Officer Z.B. in his face shield.  Gov't Mem. 11; Gov't Ex. 12, 16.  Officer Z.B. recoiled, and another officer had to help him back

---

[1] Government Exhibit 12 is a clip from a video which can be found at https://capitol-hill-riots.s3.us-east-1.wasabisys.com/Miscellaneous%20-%20Other%20people%27s%20archives/1-6-2021%20archive%20akansomi/Cop%20Vs%20The%20American%20People%21%21.mp4.  The defendant appears from 3:30 to 4:00 in the full video.

to rejoin the larger group of withdrawing officers.  Gov't Ex. 12, 16.  Government Exhibit 16 shows the punch.



Gov't Ex. 16 (cropped).

The defendant's conduct visibly shocked other rioters, several of whom gasped, moved towards him with their hands raised, and tried to calm him down.  Gov't Ex. 12.  A still from Government Exhibit 12 shows the crowd's reaction to the defendant's actions.



Still from Gov't Ex. 12 (cropped).

After the riot, the defendant expressed no remorse.  On January 9, he posted on social media about his willingness to engage in "war" to restore Donald Trump to office.  Gov't Mem. 18.  And after the FBI interviewed him, he remarked on social media, "I'd go again."  *Id.*

### B. Procedural History

Magistrate Judge Robin M. Meriweather initially approved a complaint charging the defendant with five offenses stemming from his conduct on January 6:

- Civil disorder in violation of 18 U.S.C. § 231(a)(3);
- Assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1);
- Knowingly entering or remaining in any restricted building or grounds without lawful authority in violation of 18 U.S.C. § 1752(a)(1)-(4);
- Carrying a dangerous weapon in violation of 18 U.S.C. § 1752(b)(1)(A); and,
- Violent entry and disorderly conduct on Capitol grounds in violation of 40 U.S.C. § 5104(e)(2).

Compl., ECF No. 1.

A grand jury later indicted the defendant for twelve offenses:

- Civil disorder in violation of 18 U.S.C. § 231(a)(3);
- Obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2), 2;
- Assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(l);
- Entering and remaining in a restricted building or grounds with a deadly or dangerous weapon in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A);
- Disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2);
- Impeding ingress and egress in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(3);
- Engaging in physical violence in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(4);
- Disorderly conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D);
- Impeding passage through the Capitol grounds or buildings in violation of 40 U.S.C. § 5104(e)(2)(E);
- An act of physical violence in the Capitol grounds or buildings in violation of 40 U.S.C. § 5104(e)(2)(F);
- Parading, demonstrating, or picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G); and,

- Stepping or climbing on, removing, or injuring property on the Capitol grounds in violation of 40 U.S.C. § 5104(d).

Indictment, ECF No. 14.  In a superseding indictment, a grand jury added to the 18 U.S.C. § 1752(a)(2) charge an allegation that that the defendant carried a deadly or dangerous weapon in violation of 18 U.S.C. § 1752(b)(1)(A).  Superseding Indictment, ECF No. 23.

On January 22, the FBI arrested the defendant in Stockholm, New Jersey on a warrant issued in connection with the complaint.  Rule 5(c)(3) Documents 1, ECF No. 16.  He appeared before Magistrate Judge James B. Clark III in the District of New Jersey and waived his preliminary hearing.  *Id.* at 2.  The government sought detention, but Judge Clark conditionally released the defendant.[2]  *Id.* at 2–7.  He required an unsecured $50,000 appearance bond and imposed conditions that included home detention and prohibiting the defendant from contacting victims or witnesses, traveling outside New Jersey, or entering government buildings.  *Id.* at 3–4; *see also infra* Part III.E (full list of conditions).

Judge Clark stayed the release order to allow the government to seek review in this Court, *id.* at 5, which it promptly did, Mot. for Emergency Stay and Review, ECF No. 7; Mot. for Transport Order, ECF No. 8.  Chief Judge Beryl A. Howell granted the motion, staying the release order pending review, *see* Order, ECF No. 5, and ordered the defendant transported to this District, ECF No. 6.

Following the defendant's indictment, this case was first assigned to Judge Ketanji Brown Jackson.  Judge Jackson set a briefing schedule on the issue of pretrial detention.  Minute Order

---

[2] The standard of review by a district court judge when assessing a magistrate judge's detention order under 18 U.S.C. § 3142 is de novo.  *See, e.g.*, *United States v. Henry*, 280 F. Supp. 3d 125, 128 (D.D.C. 2017).  Even if that standard might differ when the district judge possesses the records from a detention proceeding below, the standard of review in *this* case still must be de novo.  Indeed, no party has put before the Court a transcript of the detention hearing Judge Clark held or any exhibits presented in that hearing.  The Rule 5(c)(3) documents provide the only record of those proceedings.

(Mar. 15, 2021).  The government filed its memorandum, ECF No. 18, alongside a joint motion to extend the defendant's deadline to respond, ECF No. 20.  Counsel for the government explained that she:

> spoke with Attorney Harley Breite who stated that he has been retained by defendant Scott Fairlamb and that he will complete his motion for admission to the District Court for the District of Columbia by Wednesday, March 24, 2021.  Attorney Harley Breite stated that defendant Scott Fairlamb will not consent to be represented by any other attorney and requested that the government seek to extend the briefing schedule to allow for Attorney Harley Breite to make his notice of appearance in this case.  Attorney Harley Breite has requested that the deadline for the Defendant's response be moved to March 30, 2021.

*Id.* at 1.  Judge Jackson granted the motion, Minute Order (Mar. 24, 2021), but defendant did not file any opposition.  By the day the opposition was due, Mr. Breite had not appeared in the case, and the government moved for a hearing for ascertainment of counsel.  Mot. for Ascertainment of Counsel, ECF No. 21.  Judge Jackson granted the motion, set a hearing, and notified Mr. Breite. Minute Order (March 31, 2022).  Mr. Breite, in turn, wrote to Judge Jackson's chambers and stated that he intends to keep representing the defendant.  Letter to the Court, ECF No. 22.  But when the day of the hearing arrived and Mr. Breite had not yet entered his appearance, Judge Jackson vacated the hearing.  Minute Order (Apr. 8, 2021).

The next day, this case was reassigned to the undersigned.  Reassignment of Criminal Case, ECF No. 21.  The Court promptly set an arraignment and detention hearing for April 13—the next time that the D.C. Jail had an open videoconference appointment—and imposed a deadline for filing any written opposition to the government's detention memorandum.  Minute Order (Apr. 9, 2021).  The defendant still did not file any opposition.

On April 13, the Court arraigned the defendant.  At the arraignment, Mr. Breite orally moved for more time to prepare a written response to the government's detention memorandum.

After the defendant agreed to the delay and waived his right to speedy determination of detention, the Court continued the detention hearing to April 23.  On April 21, Mr. Breite lodged his written memorandum in opposition to detention with Chambers, which the Court ordered filed on the docket.  ECF No. 30.

On April 23, the Court received evidence by proffer and heard arguments on the government's motion for review of the release order.  The Court has also reviewed the government's detention memorandum, the supporting video and other exhibits, and the defendant's memorandum in opposition.

## II.   LEGAL STANDARD

The Bail Reform Act provides that the government may seek pretrial detention in one of two scenarios.  First, the government may seek pretrial detention if the case involves any of an enumerated set of offenses, including a crime of violence or a felony that involves the use of a dangerous weapon.[3]  18 U.S.C. § 3142(f)(1).  Second, the government may seek pretrial detention if the case involves a serious risk of flight, obstruction of justice, or witness intimidation. 18 U.S.C. § 3142(f)(2).

If pretrial detention is available, the judicial officer shall, upon a motion of the government, hold a hearing to determine whether there are any conditions or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of any person in the community.  18 U.S.C. § 3142(f)(1).  After the hearing, a "judicial officer shall order the pretrial release of the [defendant] . . . unless the judicial officer determines that such release will

---

[3] In determining whether an offense is a crime of violence, courts look to the elements of the offense, not the real-world conduct.  *United States v. Singleton*, 182 F.3d 7, 11 (D.C. Cir. 1999).

not reasonably assure the appearance of the [defendant] as required or will endanger the safety of any other person in the community." 18 U.S.C. § 3142(b), (e)(1).

To determine whether conditions exist that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the judicial officer shall consider four factors: (1) "the nature and the circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4). A finding that a defendant poses a risk of flight must be supported by a preponderance of the evidence. *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). And a finding that a defendant poses a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(e) (flush language).

If a defendant is ordered released, the government may file a motion for revocation of the order with the court having original jurisdiction over the offense. 18 U.S.C. § 3145(a). The court having original jurisdiction over the offense shall promptly decide the motion. *Id.* Its review of the magistrate judge's order of release is de novo. *United States v. Little*, 235 F. Supp. 3d 272, 277 (D.D.C. 2017). Furthermore, the reviewing court has discretion to call witnesses, review transcripts, or proceed by proffer. *Id.*

## III.   DISCUSSION AND FINDINGS

Because the indictment alleges that the defendant carried a dangerous weapon (the baton) while committing seven felonies, the government may seek his detention. 18 U.S.C. § 3142(f)(1); *see* 18 U.S.C. §§ 111(a)(1), 231(a)(3), 1512(c)(2), 1752(a)(1)–(4), 1752(b)(1)(A).

Thus, the Court must consider whether conditions exist that the defendant will abide by and that will reasonably assure both his appearance as required and the safety of the community. Here, the government does not assert, and the Court sees no evidence of, flight risk. So the Court

considers detention only under the dangerousness prong of the analysis.  To determine the threat a defendant poses to others and the community, the Court considers the four aforementioned factors.  *See* 18 U.SC. § 3142(g).

### A.  Nature and Circumstances of the Charged Offense

The grand jury charged the defendant with serious offenses, which can be divided into two categories.  Offenses in the first category directly relate to obstructing Congress from counting electoral votes.  *See* 18 U.S.C. §§ 1512(c)(2), 1752(a)(1)–(4), 1752(b)(1)(A).  And offenses in the second stem from his assault on Officer Z.B.  *See* 18 U.S.C. §§ 111(a)(1), 231(a)(3).  These are all serious offenses; at least one carries a twenty-year-maximum sentence.  *See* 18 U.S.C. § 1512(c)(2).  But the nature and circumstances of the defendant's assault on Officer Z.B. are particularly probative of his future danger to the community.

Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does.  The D.C. Circuit's recent detention decision in *United States v. Munchel*, No. 21-3010, 2021 WL 1149196 (D.C. Cir. Mar. 26, 2021), supports that conclusion.  In discussing the events of January 6, *Munchel* held that "those who *actually assaulted police officers* and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, *are in a different category of dangerousness* than those who cheered on the violence or entered the Capitol after others cleared the way."  *Id.* at *8 (emphases added).  In so holding, *Munchel* drew categorical distinctions between the violent and non-violent January 6 participants explaining that the former are categorically more dangerous.  And given his actions on January 6, the defendant fits into *Munchel*'s more dangerous category.

*Munchel*'s categorical distinction makes sense, given that a defendant's history of violence offers some of the strongest evidence of his future dangerousness.  *See, e.g.*, *Maryland v. King*, 569 U.S. 435, 453 (2013) ("[A]n arrestee's past conduct is essential to an assessment of the danger he poses to the public[.]"); *United States v. Tortora*, 922 F.2d 880, 888–89 (1st Cir. 1990); Bradley R. Johnson, *Assessing the Risk of Violence*, in *Psychiatric Aspects of Violence* 31, 32 (Carl C. Bell ed., 2000) ("The single best predictor of violence is a history of violence.").   And *Munchel* recognized that in the detention context, courts may rely on defendants' violent actions undertaken on January 6 in determining their future dangerousness.  *See* 2021 WL 1149196, at *8 (requiring individualized assessment but looking to violent conduct on January 6 as probative of future dangerousness).  In looking to past conduct, courts reflect the purposes of the Bail Reform Act of 1984, which aimed to incapacitate those pretrial defendants who are most likely to commit violent acts while awaiting trial.  *See United States v. Salerno*, 481 U.S. 739, 742 (1987) (citing S. Rep. No. 98-225 at 3 (1984)).

The Bail Reform Act of 1984 itself also clearly expects that courts should rely on defendants' past violent conduct to predict (and thus to detain) those most likely to commit violent acts while awaiting trial.  *See United States v. Salerno*, 481 U.S. 739, 742 (1987) (citing S. Rep. No. 98-225 at 3 (1984)).  Indeed, Congress passed the Act to ensure that courts could consider what Congress thought the most reliable evidence of future dangerousness: past conduct.  *See* S. Rep. No. 98-147 at 22 (1983) ("When the court makes a determination about the likelihood of dangerous conduct between arrest and trial, it is not idly gazing into a nonexistent crystal ball, but instead examining a reliable record of past conduct. The [pre-1984 law], in effect, blacks out that aspect of the record *most relevant* to the public safety, dangerousness of the defendant, and leaves the court to make its projection based solely on the risk that the suspect will not appear for trial.

The [pre-1984 law] does not prevent courts from predicting but only withdraws *that part of the record that would make the forecast reliable*." (emphases added)).  Because the defendant was among the more dangerous of the January 6 participants, he is more likely to endanger the community if released pending trial.  Thus, the nature of his offenses favors detention.

The circumstances of the offenses charged also show dangerousness.  When the defendant encountered police officers, he berated them.  He then shoved Officer Z.B. and punched him in the head.  Unlike others who obstructed Congress through their presence alone, the defendant employed violence to obstruct Congress's count.  He also targeted law enforcement while the police were struggling to control the Capitol.  That conduct contributed to the chaos on Capitol Hill.  *Cf. United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *9 (D.D.C. Feb. 26, 2021) (Howell, C.J.) ("concerted and deliberate efforts to undermine law enforcement" weighs heavily in favor of detention).  That the defendant was willing to create or take advantage of those circumstances to harm law enforcement supports detention.  Yet nothing about the defendant's assault turned on the presence of a mob on January 6. To the contrary, other rioters appeared shocked by his assault and tried to calm him down.  This was not a case in which "the presence of the group was critical to [his] ability to obstruct the vote and to cause danger to the community."  *Munchel*, 2021 WL 1149196, at *7.

The defendant attempts to minimize the nature and circumstances of the charged offenses by asserting that "[i]f [he] were truly the predatory wrecking machine as he is portrayed by the Government, he would have intended and actually caused something far greater than what is routinely referred to as a misdemeanor simple assault."  Def.'s Opp'n 6.  In essence, the defendant says that he poses no danger to the community because he did not shove and punch Officer Z.B. *that hard*.  First, shoving and punching a federal police officer is not a simple misdemeanor.

Congress decided to treat assault on federal officers as a serious crime, and for good reason. 18 U.S.C. § 111(a)(1); *see United States v. Feola*, 420 U.S. 671, 680–82 (1975) (describing Congressional concern with protecting safety of federal law enforcement officers). The defendant is not charged with "misdemeanor simple assault," Defs.' Opp'n 6, but a felony punishable by up to eight years in prison, 18 U.S.C. § 111(a). Congress's judgment reflects the serious nature of his act. Thus, the defendant's efforts to analogize his conduct to a simple scrap fall flat. Second, the Court disagrees with the defendant's characterization of the facts. He shoved Officer Z.B. hard enough to make him stumble. He also hit Officer Z.B. in the head, risking serious injury. That conduct is serious.

The defendant also tries to brush off the fact that he picked up a police baton and carried it into the Capitol. His counsel suggests that the defendant simply picked up the baton to prevent others from using it as a weapon. But that depiction of the defendant's motives is not credible. A person who acts to protect others from a dangerous weapon does not waive it around. Nor does he post to social media claiming to be a "patriot" for "disarm[ing]" someone.[4] *See* Gov't Ex. 8. Least of all would he carry it into the Capitol building fully extended and ready to use. *See* Gov't Ex. 10. To claim otherwise defies common sense.

Finally, the defendant tries to minimize his words on January 6. His counsel says that the videos demonstrate "hypermasculinity" and "puffery," rather than dangerousness. Detention Hr'g. But the defendant's actions on January 6 belie those claims. He said it was time to "put up or shut up" and then he, as promised, put up, assaulting a police officer. When a person follows through on a threat, his words cannot be taken as hyperbolic.

---

[4] The record includes no that the defendant actually took the weapon from a person. Rather, it shows him picking it up from the ground after rioters routed a police barricade. *See* Gov't Ex. 6–7. Even so, the defendant's words are probative of his intent in picking up the weapon. And they do not that suggest public safety was at the top of his mind.

For those reasons, the nature and circumstances of the charged offenses strongly supports detention.

**B.  Weight of the Evidence**

Substantial evidence supports the government's arguments that the defendant threatens the community.  Video evidence depicts all of the conduct for which the grand jury charged the defendant.  The defendant's assault on Officer Z.B. appears on video.  He cannot reasonably dispute that it occurred.  The weight of the evidence against the defendant strongly supports detention.  *See Chrestman*, 2021 WL 765662, at *10, 14.

**C.  History and Characteristics**

The defendant has a significant criminal history.  He pleaded guilty to unlawful possession of a handgun in 2006 and to aggravated assault in 2009.  Gov't Mem. 17.  He was charged with aggravated assault in 2018 and pleaded guilty to simple assault.  *Id.*  17–18.  Thus, the defendant has two prior assault convictions.[5]

These convictions show that the threat of punishment does not deter the defendant from harming others.  His most recent assault conviction was just two years ago.  Moreover, in both incidents, the defendant punched his victims in the face—just as he did with Officer Z.B.  *See id.* at 17–18.  Two well-established principles support detention.  First, the defendant's consistent modus operandi is especially probative of recidivism.  *Cf. United States v. Bridges*, 175 F.3d 1072 (D.C. Cir. 1999) (holding that real-world conduct establishing a pattern of behavior provides a strong indicator that an offender will commit other crimes).  Second (and to reiterate), a defendant's history of violence offers some of the strongest evidence of his dangerousness.  *See,*

---

[5] He was also charged with aggravated assault in 2002 and aggravated assault and robbery in 2008.  Gov't Mem. 17. The 2002 charge was no billed, and the 2008 charge was dismissed.  *Id.*  The Court gives minimal weight to those arrests and charges, because they did not result in convictions.

*e.g.*, *Maryland v. King*, 569 U.S. 435, 453 (2013); *United States v. Tortora*, 922 F.2d 880, 888–89 (1st Cir. 1990); *Munchel*, 2021 WL 1149196, at *8; S. Rep. No. 98-147 at 22 (1983); *see also* U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders* 3 (Jan. 2019), https://www.ussc.gov/ sites/default/files/pdf/research-and-publications/research-publications/2019/ 20190124_Recidivism_Violence.pdf ("Offenders who engaged in violent criminal activity— whether during the instant federal offense or as part of prior criminal conduct—generally recidivated at a higher rate, more quickly, and for more serious crimes than non-violent offenders.")  In other words, the defendant's history of punching people in the face suggests that he may punch people in the face again.  *See Munchel*, 2021 WL 1149196, at *7 (requiring identification and articulation of the threat to the community to detain defendant).  The Court thus finds that the defendant's criminal history provides relevant and reliable evidence that he will continue to assault people if released pending trial.

In response, the defendant raises his ties to his New Jersey community.  He has lived in New Jersey his entire life, cares for his disabled mother, has an "excellent relationship" with his sister, owns a home in Stockholm, and owns and operates a gym in Pompton Lakes.  Def.'s Opp'n 3.  He married his wife in September 2019.  *Id.*  He also represents that he acts charitably towards others.  *Id.* at 7–8.  The defendant's strong ties to his community and self-employment provide a thumb on the scale in favor of pretrial release.  The Court does, however, note that those ties were not enough to prevent the defendant from leaving his community, going to the Capitol, and assaulting a police officer.  Thus, the Court gives the ties limited weight.

The defendant also raises his health conditions.  First, he was diagnosed with leukemia in 2010, for which he continues to take medication and see his physician.  *Id.*  at 4.  Yet as the defendant had that condition on January 6, his status as a leukemia patient does not ameliorate his

dangerousness. Indeed, the defendant's conduct on January 6—scaling scaffolding and punching police—shows his vigorousness, in stark contrast to the picture the defendant draws of himself in his memorandum. *See* Gov't Ex. 1  Second, though the defendant had a heart attack in February following his arrest, he says that he is in good health and has been encouraged to exercise. *Id.* Again, because the defendant's heart attack does not appear to have significantly affected his health (so that he is still able to engage in physical activity), it does not alter the danger he poses. Neither of the defendant's health conditions move the needle on detention.

Balancing the defendant's criminal history against the defendant's ties to his community and self-employment, the Court finds that the defendant's history and characteristics support detention. That is so because the defendant's criminal history provides reliable evidence that the defendant will engage in violence again, despite his community ties.

### D. Danger to the Community

The Court finds that the defendant poses a threat to law enforcement officers—as well as others who might have the misfortune of triggering the defendant's rage. *See Munchel*, 2021 WL 1149196, at *7 (requiring identification and articulation of the threat to the community to detain defendant). As the defendant's criminal history reveals, he need not be part of a riot to assault another person. Nor does he seem to need political provocation. *See, e.g.*, Gov't Mem. 14 (describing assault during theft). Indeed, the defendant's willingness to assault a police officer on January 6—in the full view of other officers, scores of bystanders, and many cameras—confirms that, when enraged, he poses a danger to the community.

As noted before, *Munchel* drew categorical distinctions between violent and nonviolent January 6 rioters. *See* 2021 WL 1149196, at *8. The defendant's violent conduct on January 6, combined with his history of similar violence, puts the defendant in the violent category. And

although the specific circumstances of January 6 made it possible for the defendant to assault a police officer, based on the defendant's repeated history of punching people in the face, the Court finds that he poses a threat to others even without assistance from a mob. *See Munchel*, 2021 WL 1149196, at *8 (requiring courts to consider before detaining January 6 defendants "whether [defendants] pose[ ] an articulable threat to the community in view of their conduct on January 6[ ]" and whether "the specific circumstances that made it possible, on January 6, for [defendants] to threaten the peaceful transfer of power.").

In opposing detention, the defendant relies on *United States v. Klein*, No. 21-cr-263-JDB, 2021 WL 1377128 (D.D.C. Apr. 12, 2021). *See* Def.'s Opp'n 7. In *Klein*, the court released a January 6 defendant pending trial. 2021 WL 1377128, at *13. While Mr. Klein had no criminal history and had obtained a top-secret security clearance, *id.* at *10, he also "demonstrated a clear and persistent willingness to use force against law enforcement to attempt to gain entry into the Capitol and to stop the certification of the election." *Id.* at *9. The *Klein* court also emphasized that Mr. Klein did not plan his violent acts. *Id.* at *12.

*Klein*'s holding offers little help to the defendant. It is neither binding nor persuasive, and the defendant's history of violent conduct distinguishes him from Mr. Klein. *Klein*'s reasoning falls short in several ways. It ignores the *Munchel* court's *categorical* approach and instead places January 6 defendants on a *spectrum* of violence. *Id.* at *11. It thus gives violent defendants too much credit for not being even more violent. And it fails to acknowledge that past violence is particularly probative of future violence. Moreover, by anchoring its analysis to other courts' decisions about other defendants, the *Klein* court failed to decide detention individually. *See Munchel*, 2021 WL 1149196, at *7 (quoting *Tortora*, 922 F.2d at 888). The Bail Reform Act does not call for consideration of potential disparities between defendants. Instead, it calls for close

analysis of the relevant factors and evidence in an individual case.  For these reasons, the Court declines to follow *Klein*.

Even if the Court thought *Klein* soundly reasoned, the defendant's case is distinguishable. The record in *Klein* "does not establish that [Mr. Klein] intended to injure others.  2021 WL 1377128, at *9.  Here, the Court finds that the defendant intended to injure Officer Z.B. when he shoved and punched him.  So the defendant's conduct cannot be discounted like Mr. Klein's.  And the defendant's history of violence meaningfully distinguishes him from Mr. Klein, who had no criminal history and a top-secret security clearance.  Even if Mr. Klein is only a danger in a mob, the defendant's criminal history shows that he is willing and able to commit acts of violence without one.

The defendant also points to a passage in *Klein*, noting that the government did not seek to detain some defendants who assaulted police officers.  2021 WL 1377128, at *12.  But the government's failure to seek detention in one case does not doom its efforts to safeguard the community in another.  The Bail Reform Act requires the Court to apply defendant-specific factors, not to judge dangerousness based on how the Executive exercised its prosecutorial discretion in distinguishable cases.

Finally, the defendant argues that he is not a danger to the community because the FBI "waited" eight days after it first sought to interview him to arrest him.  Def's Opp'n 7.  But while eight days lapsed between interview and arrest, that does not show that the FBI decided to "wait" eight days because it considers the defendant so anodyne.  To the contrary, the January 6 events have led to one of the largest federal criminal investigations ever; an effort that has no doubt stretched federal resources thin.  That it took the FBI several days to arrest the defendant in the

context of this massive investigation is unsurprising.  Nor is it evidence that the FBI does not consider the defendant a danger.

In sum, the potential danger the defendant poses to law enforcement officers and the community at large supports detention.

### E. Potential Release Conditions

No potential conditions of release the defendant has suggested would adequately mitigate the danger he poses to the community.  Given his history of violence, the defendant has demonstrated that he can be violent even when not surrounded by a mob.  And the defendant's alleged conduct in this case—assaulting a police officer—shows a disregard for law and order and for those sworn to uphold it.  *Cf. United States v. Sabol*, No. 21-cr-35-EGS, 2021 WL 1405945, at *18 (D.D.C. Apr. 14, 2021) ("[T]he Court is not persuaded that [conditions of release] would mitigate [the defendant's] continued danger to the community based on his demonstrated willingness to engage in violence in furtherance of his beliefs."); *Chrestman*, 2021 WL 765662, at *16 ("[The defendant's] very actions on January 6 make apparent that this defendant will follow his beliefs . . . even when the laws designed to protect our democracy prohibit his conduct.").  The defendant's lack of remorse supports this conclusion.  *See* Gov't Mem. 18 ("I'd go again.").  The defendant's belief that he did nothing wrong undercuts his claim that he will conform his conduct to the law if released.

The defendant argues that twelve conditions—those set by Judge Clark—are enough to protect the community.  Because those are the conditions the defendant has represented that he would abide by, Def.'s Opp'n 4–5; Detention  Hr'g (proffer by defense counsel), they are the conditions the Court considers.  *See, e.g.*, *United States v. Epstein*, 425 F. Supp. 3d 306, 324–26 (S.D.N.Y. 2019) (considering adequacy of proffered package); *United States v. Tajideen*, No. 17-

cr-46-RBW, 2018 WL 1342475, at *4 (D.D.C. Mar. 15, 2018) (same), *aff'd*, 724 F. App'x 6 (D.C.

Cir. 2018).  Those conditions are:

1. Home detention, with electronic monitoring, except for stationary and verifiable employment; education; religious services; medical treatment; attorney visits; court appearances; or other activities as preapproved by Pretrial Services;
2. Supervision by Pretrial Services;
3. Installation of landline telephone;
4. Surrender of passport;
5. Restriction on travel to New Jersey (or D.C. for court purposes);
6. Drug testing and treatment as directed;
7. Maintenance of current residence;
8. Maintenance of stationary and verifiable employment;
9. Prohibition on possessing firearms;
10. Prohibition on entering government buildings;
11. Prohibition on contacting victims and witnesses; and,
12. Requirement to appear at all future court proceedings.

Def.'s Opp'n 4–5.  None of these conditions provide even reasonable assurances that the defendant

will not assault another person on pretrial release.

First and foremost, the home detention conditions allow the defendant to enter the world

and encounter other people for many purposes.  Though they would prevent the defendant from

going golfing or to the movies, the proffered list is so littered with such broadly worded exceptions

that it's barely "detention" at all.   Under the proposed conditions, the defendant could wake up,

go to church, get some acupuncture, work for a few hours, pay a visit to a real estate lawyer to

discuss partnership documents, and work for a few hours, all before returning home.  For that

matter, he could also attend educational archery or knife-fighting lessons, assuming he had time

left over from all the other activities his "detention" conditions would permit.[6]   In other words,

these "detention" conditions fail to mitigate the danger the defendant poses to the community—

his propensity to assault other people—because they allow him to roam freely in public.

---

[6] The conditions do not even prohibit the possession of weapons—only of firearms.

Nor do the remaining conditions make up for the inadequacy of his proposed home detention plan. Take them in turn. The second, supervision by Pretrial Services, requires only intermittent check-ins. It does nothing to prevent the defendant from reoffending when he is not on the phone with Pretrial Services. The third, installation of a landline telephone, helps enforce home detention. But it does not account for the exceptions to home detention. The fourth, surrender of the defendant's passport, alleviates none of the Court's concerns about his dangerousness because he is not a flight risk. The fifth, restricting the defendant to his home state, accomplishes little because the defendant committed his prior offenses without leaving New Jersey. The sixth, drug testing, does not ameliorate the defendant's dangerousness as the defendant is not alleged to have committed his offenses under the influence of drugs. (He is apparently quite violent even when sober.) The seventh and eighth, maintenance of residence and employment, make the defendant easier to find. But neither condition would prevent him from encountering other people whom he may assault. The ninth, a prohibition on carrying firearms, fails to address what makes the defendant dangerous: his rage and his fists. Indeed, the defendant is not alleged to have carried a firearm on January 6. And nothing on the record suggests that he carried a firearm any other time he punched another person in the face. The tenth, a prohibition on entering government buildings, would not stop the defendant from assaulting others. Nothing about an assault requires entering a government building. To take the instant example, the defendant punched Officer Z.B. *outside* the Capitol building. The eleventh, a prohibition on contacting victims and witnesses, does not abate the defendant's recidivism risk since his risk is not limited to those present on January 6. The twelfth, a requirement to attend future proceedings, is a nullity. The defendant is not a flight risk and would be subject to contempt anyway if he failed to show up

to a court proceeding.   None of these conditions (separately or in combination) addresses the inadequacies of the defendant's proposed home detention plan or his underlying dangerousness.

Given the defendant's criminal record, his brazen actions in front of law enforcement officers, and his lack of demonstrated remorse for his actions, the Court cannot credit the defendant's assertions that would comply with release conditions.   Thus, considering the defendant's dangerousness, the Court finds that no condition or combination of conditions of release would safeguard the community. *See Munchel*, 2021 WL 1149196, at *5.

\* \* \*

The Court finds that the nature and character of the charged offenses, the weight of the evidence, the defendant's history and characteristics, and the danger the defendant poses to the community all support pretrial detention.   The defendant's history of assault, coupled with his assault on a police officer on January 6, show that he is a serious danger to the community. Because no conditions can be imposed to reasonably ensure he will not pose a danger to others pending trial, he must be detained.

## IV.   CONCLUSION

For these reasons, by separate order the Court will **GRANT** the government's motion for review and **ORDER** the defendant detained pending trial.   An order of detention accompanies this Memorandum Opinion.

Date: _____4/26/21_____

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge