```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      ) Criminal Action
                                     ) No. 21-cr-120
 4                    Plaintiff,     )
                                     ) DETENTION HEARING
 5    vs.                            ) BY VIDEO
                                     )
 6    Scott Kevin Fairlamb,          ) Washington, DC
                                     ) April 23, 2021
 7                    Defendant.     ) Time:  2:00 p.m.
      _____
 8
                  TRANSCRIPT OF VIDEO DETENTION HEARING
 9                           HELD BEFORE
                THE HONORABLE JUDGE ROYCE C. LAMBERTH
10                   UNITED STATES DISTRICT JUDGE

11    _____

                        A P P E A R A N C E S
12

13    For the Plaintiff:       Leslie A. Goemaat
                               Gauri Gopal
14                             Assistant United States Attorney
                               555 4th Street, N.W.
15                             Washington, DC  20530
                               202-803-1608

16    For the Defendant:       Harley Breite
                               The Law Office of Harley D. Breite
17                             562 Black Oak Ridge Road
                               Wayne, NJ  07470
18                             973-872-0604

19    _____

20    Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                               Official Court Reporter
21                             United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
22                             Washington, DC  20001
                               202-354-3267
23

24

25
```

```
 1                   THE COURTROOM DEPUTY:  All right.  Good afternoon,

 2      everyone.  This Honorable Court is now in session, the

 3      Honorable Royce C. Lamberth is presiding.

 4                   Your Honor, we're here today for criminal detention

 5      hearing in 21-120, the United States of America versus Scott

 6      Kevin Fairlamb.

 7                   Government counsel for the government, please

 8      identify yourself for the record.

 9                   MS. GOEMAAT:  Good afternoon, Your Honor.  Leslie

10      Goemaat and Gauri Gopal on behalf of the United States.

11                   MR. BREITE:  Good afternoon, Your Honor.  Harley

12      Breite on behalf of the defendant, who is present.

13                   THE COURTROOM DEPUTY:  And, Your Honor, we also have

14      representation from pretrial services.

15                   PRETRIAL SERVICES:  Andre Sidbury from pretrial

16      services.

17                   THE COURT:  Okay.  Mr. Fairlamb, can you hear me all

18      right?

19                   THE DEFENDANT:  Pardon?

20                   THE COURT:  I just wanted to know if you can hear me

21      all right.

22                   THE DEFENDANT:  I just turned the volume up, Your

23      Honor.  Good.

24                   THE COURT:  All right.  So the defendant's counsel

25      can proceed there on your motion.
```

1     MR. BREITE:  Your Honor, I will rely heavily on the

2   submission, the memorandum I submitted.  But, in a short, it's

3   clear that Mr. Fairlamb is neither a risk of flight or a danger

4   to the community.  He doesn't pose any concrete prospective

5   threat to the community or any other person that cannot be

6   mitigated by strict conditions.  There are many, many

7   conditions the Court could impose to ensure that Mr. Fairlamb

8   is not a danger to the community or any person and that would

9   reasonably assure the safety of any person or the community.

10     In fact, this was already done at his previous

11   detention hearing, Judge Clark did release him, order his

12   release under a plethora of conditions.  In fact, one of those

13   conditions was that my client employ a landline telephone.  I

14   didn't even know they existed anymore, but apparently they do.

15   And not to be presumptuous -- the government, obviously, asked

16   for a stay and an appeal and my client remained detained.  Not

17   to be presumptuous, but immediately thereafter my client's wife

18   went and obtained a landline, so it's already in place.  But

19   again, not to be presumptuous, I just advised her to do it to

20   show -- to be proactive and show good intent.

21     In addition to that, all of the -- there's a list of

22   recommendations, as far as conditions pretrial services made in

23   a report when this matter was first heard in New Jersey.  I

24   believe all of those conditions can be applied, any number of

25   them can be applied and would assure the safety of the

1    community.

2           As I went into more detail in my memorandum -- of

3    course, now Your Honor and the government has discovered that

4    no one will ever confuse me with the world's best memorandum

5    writer or legal research person, but I hope that I've put forth

6    enough to make the argument that this Court, respectfully,

7    should release my client so that he can come back to salvage

8    what's left of his personal business, his mortgage, his wife,

9    his mother; also, to improve his health, as well.

10          So for all of the factors that I listed and the

11   arguments I made in my memorandum, I would rely on those.  But

12   if Your Honor wishes me to elaborate on anything specific, I

13   would be more than happy.  But I don't know that Your Honor

14   wishes me to take up much more time subsequent to the

15   submission of the memorandum.

16          THE COURT:  Well, I take it that you concede that the

17   photos that government placed in the record do demonstrate your

18   client actually assaulting the police officer?

19          MR. BREITE:  Respectfully, I don't concede that.  I

20   probably will have to concede that my client was on the

21   premises of the Capitol and entered the Capitol, but as far as

22   the actual assault, given that I don't know what precipitated

23   and what came immediately before and other circumstances,

24   respectfully, Judge, I can't concede at this point.  However,

25   I'm well aware of what those pictures depict in that one moment

1    of time, yes, sir.

2         THE COURT:  And then the next problem, he did have

3    what appeared to be a weapon.  In other words, that whatever he

4    was carrying would appear to meet the definition of a weapon,

5    wouldn't it?

6         MR. BREITE:  Certainly, Judge, the baton that I

7    believe was recognized might -- the government concedes that my

8    client found it on the floor while there.  I think it's

9    important to distinguish that he didn't bring it with him from

10   New Jersey, through Delaware, through -- my geography is poor,

11   I'm sorry -- but at least Maryland and into Washington, D.C.

12   with him.  There was no premeditation to bring any weapon.  He

13   picked it up.

14        I will say this, Your Honor:  It appears that the

15   government is going to produce a video, or at least photos of

16   my client holding that baton.  However, there is no video or

17   photo, that I'm aware of, of my client using that baton as a

18   weapon.  One could argue, if one were so inclined, that he

19   picked it up so that nobody else could take it and strike

20   someone else.  One could make that argument.

21        However, it is clear that my client never used that

22   baton as a weapon.  And, so, was he in possession of it?  It

23   appears so.  Did he use it?  Absolutely not, Your Honor.

24        THE COURT:  The only other question is:  You, I take

25   it, do not dispute his prior arrest and conviction record that

1    was reported?

2          MR. BREITE:  Your Honor, I don't dispute my client's

3    criminal case history, his two convictions.  His two major

4    convictions go back to 2008 and 2009.  I would also note, as I

5    did in the memo, that they were -- and again, I'm not trying to

6    diminish the serious nature of any charge.  However, the result

7    of both of those matters was a noncustodial sentence, let's

8    say.  There was no prison and no jail time.

9          His most recent case, of which I am intimately aware

10   of, several years ago, resulted in a simple assault, which in

11   the state of New Jersey is not a crime, it's what people

12   sometimes refer to as a misdemeanor.  There was no period of

13   incarceration, he simply paid a fine.  And I am intimately

14   aware of that case.  I represented him on that matter.

15         THE COURT:  That's the 2018 case?

16         MR. BREITE:  Yes, sir.

17         THE COURT:  Okay.  Let me hear from the government.

18         MS. GOEMAAT:  Thank you, Your Honor.  Briefly in

19   response to defense counsel's points, and then I would like to

20   talk about the Bail Reform Act factors.

21         With respect to the assertion that we don't know what

22   precipitated or came immediately before, we do know what

23   precipitated or came immediately before the assault because

24   it's on the video.  The video shows, as does the body-worn

25   camera that's submitted, that Mr. Fairlamb is following a line

1    of police officers who are dramatically outnumbered, and he is

2    screaming vitriols at them, asking them do they know what the F

3    they're doing, are they American?  And then he actually comes

4    in between two police officers, which is serious because it's

5    essentially a daisy chain of police officers, dramatically

6    outnumbered by rioters, who are trying to stay in a tight

7    formation so they can make it to a larger group of MPD officers

8    and to safety.

9         He interrupts that chain of officers.  And when the

10   police officer -- that's Officer Z.B., the victim in this

11   case -- when he tries to just move him and get around him, the

12   defendant violently shoves him into onlooking rioters and then

13   punches him.  And it's entirely caught on video, so we don't

14   even need to really debate the facts of it because the Court

15   can watch video, Exhibit 12, and come to the Court's own

16   conclusion.  But I would respectfully disagree that we don't

17   know what precipitated it.

18        And with respect to the baton, we certainly do

19   concede that he picked it up from the ground.  We have video of

20   that.  But the video also shows he picks it up from the ground

21   while he was in the middle of an enormous horde of rioters who

22   are basically rushing the metal barricade, that at one point

23   were one of the outer -- outer limits of the police line.  The

24   huge horde of rioters overcomes the, again, dramatically

25   outnumbered police.  Mr. Fairlamb is part of that large hoard

1    of rioters and it's during that process that he decides, while

2    he is overcoming a police line, that he needs to reach down and

3    pick up a police baton.

4         And with respect to the defense counsel's claim that

5    he was perhaps trying to protect other people, I would say

6    that's utterly belied by his own words.  Your Honor has video,

7    Exhibit 8, which is a Facebook video from Mr. Fairlamb that he

8    posted during the event and in it he holds the baton and he

9    says -- pardon my language -- "This is what f-ing patriots do.

10   We disarm them and we f-ing storm the Capitol."  Those were his

11   words, probably nearly immediately after picking up the baton.

12        Now, Your Honor, we don't think he disarmed a police

13   officer, we think he found it on the ground.  That seems pretty

14   clear from the video.  But those were his words with respect to

15   the baton.

16        And as to his prior arrest and conviction record, we

17   don't agree that a misdemeanor is not a crime.  A misdemeanor

18   is a crime.  And I think the facts of each of these arrests and

19   convictions is very relevant to the Court's determination under

20   the history and characteristics.

21        But I would like to back up briefly and go to the

22   facts, briefly, underlying our motion for detention.  A lot of

23   this is laid out in our memorandum, so by all means, Your

24   Honor, if this is duplicative, let me know.  But as the Court

25   at this point is very well aware, on January 6th a large,

1     violent crowd forced their way into the Capitol building during

2     the certification and members of Congress were evacuated.

3     We're here because of the defendant's role during that day.

4            Mr. Fairlamb, who is a former MMA fighter and has a

5     gym in new Jersey, came to Washington, D.C. for the rally.  He

6     participated in the storming of the Capitol.  And many of his

7     actions are well documented by a series of videos that have

8     been obtained by the FBI.  These are in chronological order in

9     the government's memorandum and I would like to highlight some

10    of that evidence.

11           At the very beginning the Court can see Mr. Fairlamb,

12    which is Exhibit 1, in the scaffolding that had been erected

13    outside of the Capitol.  Exhibit 1 is a photo from -- very long

14    video, a JaydenX video, which documents at various times the

15    original movement of the defendant, as early as we've managed

16    to document.

17           But the defendant then streamed his own video from

18    that scaffolding, where he clearly stated what his intentions

19    were.  And that's video Exhibit 2, which I encourage the Court

20    to watch, if the Court hasn't had an opportunity.  And in that

21    video he screams, "We ain't f-ing leaving either.  We ain't

22    f-ing leaving."  I think that's very important because he makes

23    it crystal clear in his own words, before he's even entered the

24    Capitol on that day, what his plan is.  And his plan is to not

25    leave.

1          Several minutes later that video, the JaydenX video,

2     shows the hoard of rioters who are successfully crushing

3     through the police line.  They have those metal -- essentially,

4     they look like half metal bike racks.  They have successfully

5     crushed through there.  And Exhibit 5 in the Government's

6     memorandum is a still from that video showing when that line is

7     breached.

8          Mr. Fairlamb is in that crowd; 18 seconds after the

9     breach of the line is when Mr. Fairlamb is seen crossing what

10    was basically the original skirmish line.  He then decides to

11    pick up a baton.  And as I mentioned earlier, I think it's very

12    important to think, Why does Mr. Fairlamb at this moment, when

13    he is crossing what previously was a police line that has now

14    been breached, why does he think he needs to pick up a weapon?

15    So he picks up the weapon.  And then we have video Exhibit 8,

16    which is his Facebook video where he explains what patriots do,

17    "We f-ing disarm them and then we storm the f-ing Capitol," in

18    his own words.  Exhibit 9 is a still from that video.  And then

19    Mr. Fairlamb entered the Capitol.  And while many people

20    entered the Capitol on that day, Mr. Fairlamb was one of the

21    very first people through this particular entrance.

22          The way these rioters gained entrance at this

23    location was by first smashing through a window with a riot

24    shield and then rioters jumped through the window, kicked out

25    the door, and then in comes Mr. Fairlamb, the defendant, with a

1    baton, very early on when the Capitol was breached.  And now he

2    has entered the Capitol, there's broken glass on the ground and

3    he has this baton.  And why does he have this baton?  Nobody

4    knows what was going through his head, Your Honor, but picking

5    up a dangerous weapon to accompany with you while you breach a

6    Capitol building, I think the inference is clear, that he was

7    arming himself in case there was going to be violence.  And we

8    agree with Mr. Breite, that at this point there is no evidence

9    that has been developed that he used the baton against anybody.

10   But he kept it and it was seized in the search warrant at his

11   house.

12          Now, he leaves just a couple of minutes later, which

13   is also shown on the JaydenX video.  Fast forward approximately

14   30 minutes, Your Honor, and video Exhibit 12, which is a

15   shorter clip of a much longer video -- it's probably available

16   on the link that is in our memorandum -- video Exhibit 12 shows

17   the defendant aggressively following this line of police

18   officers.  They are completely outnumbered by the rioters as

19   they try to navigate through this enormous crowd.  And he is

20   screaming at them and harassing them and screaming, asking

21   whether they're an American, telling them they have no idea

22   what the F they're doing.  And that is when we get to the shove

23   and the punch which forms the core of the 111 charge in this

24   case.

25          Video Exhibit 14 is body-worn camera of the same

1    event.  But it is helpful because you can clearly hear the

2    defendant, you can see how close he is to this line of police

3    officers in video Exhibit 14.

4            So those are the facts as we've developed them about

5    Mr. Fairlamb's participation in the riot on that day, Your

6    Honor.  And briefly, the nature and circumstances of the

7    offense and all of the 3142 factors weigh very, very heavily in

8    favor of detention.  This offense, as with all the Capitol riot

9    offenses, is deeply serious.

10           He participated in an assault on our democracy.  He

11   participated in storming a scrimmage line, he picked up a

12   weapon, he was one of the first people into the Capitol.  He

13   followed and harassed a line of police officers and then he

14   shoved and violently struck one.  These are serious offenses.

15   All of his actions on that day show a total disregard for the

16   rule of law and willingness to engage in violence.

17           As we detailed in our memorandum, subsequent search

18   warrants on his Instagram and his Facebook account bolster the

19   impression left by his actions that day that he had every

20   intention of engaging in violence.  On the way down to the

21   Capitol he stated, essentially, "How far are you going to go to

22   defend our constitution?  Put up or shut up.  Put up or shut

23   up."  These are not the words of somebody who is going to

24   attend a peaceful protest.  "How far are you going to go?" and

25   "Put up or shut up" are the words of somebody who is planning

1      to possibly engage in violence.

2             After the riot, several days later, he posted,

3      "Whiner Biden, Pelosi.  All laptops in our possession."  In so

4      doing he clearly aligned himself and positioned himself with

5      others who on that day stole Speaker Pelosi's laptop.  And he

6      showed no remorse.  And certainly there's no evidence that he

7      stole a laptop, but he celebrated and was taking credit for the

8      crimes of his fellow rioters.

9             And finally, with respect to the nature and

10     circumstances of the offense, Mr. Fairlamb faces a substantial

11     term of imprisonment for his offenses.  So for those reasons,

12     the nature and circumstances of the offense weigh very heavily

13     towards detention.

14            The weight of the evidence, I'll spend very little

15     time on this, except to say the entire case is captured on

16     video.  The evidence is cumulative and I think

17     incontrovertible.  So this factor certainly weighs very heavily

18     towards detention.

19            The history and characters of the defendant weigh

20     heavily toward detention.  We just don't agree with the defense

21     counsel's characterization of his criminal arrest and

22     conviction record.  He has been charged on multiple occasions

23     with aggravated assault.  He has two assault convictions.  And

24     all of the fact patterns are somewhat similar and involve him

25     in hand-to-hand combat with the victims.

1        I'll also note, Your Honor, that his significant

2   criminal history does distinguish him from some other Capitol

3   riot defendants who have been held.  For example, *Chansley*, who

4   was, I believe, held by this Court, 21-CR-3, had no criminal

5   history, *Sabol*, which I believe is S-A-B-O-L, 21-cr-35, in

6   front of Judge Sullivan, also had no criminal history.

7        But in addition to his criminal history, I would ask

8   the Court to consider the video evidence of the defendant's

9   affect on January 6th as shown in his own social media videos.

10  I would direct the Court to video Exhibit 2 and 8, which were

11  the Instagram and Facebook videos that he recorded and streamed

12  or posted.  And in both of those videos he is screaming at the

13  top of his lungs, he seems completely out of control.  And

14  video Exhibit 12 showing the assault, I would submit, shows a

15  hair-trigger temper, which is also consistent with the fact

16  patterns that gave rise to the other arrests and assault

17  convictions.

18        Finally, the Instagram and the Facebook warrants

19  revealed very concerning communications.  In particular,

20  Mr. Fairlamb had communication with a user where he first

21  promoted the conspiracy theory that President Trump would be

22  inaugurated on March 4th as the president of the new republic.

23  And when the other user asked what will happen with all of the

24  unhinged liberals if that happens?  His answer was, "War versus

25  patriots.  They don't want that.  It's go time."  And then he

1    says, "Q said this word for word."

2         And so it is clear that he ascribes to these

3    conspiracy QAnon theories and that he is ready himself for some

4    kind of violence.  In fact, after the FBI came to interview

5    him, he had another communication on Instagram with respect to

6    the FBI interview.  His answer was, "All good.  I go again."

7    And I would submit to Your Honor that those three words, "I go

8    again," are the most concerning of all of the statements that

9    were identified and they go exactly to the heart of the

10   question here, which is does this defendant pose a concrete,

11   prospective threat.  And we submit that he does because in his

12   own words he said, "I go again."  This factor, therefore, also

13   weighs very heavily in favor of detention.

14        And, finally, danger to the community -- a factor

15   which in many ways encompasses the three prior factors -- we

16   find weighs very heavily in favor of detention; his belief that

17   there will be war, his belief that it's go time, his intention

18   to go again indicates that he is a clear future danger.  His

19   actions, documented by video on January 6th, show that he is a

20   physical danger to those who oppose him and, frankly, they are

21   consistent with his prior history of arrests and convictions

22   for assault.

23        I'll point out that there were many FBI tips in this

24   case, but one specifically requested anonymity because the

25   tipster, quote, deeply and strongly fears retribution against

1    myself, my company, and my family.  And I've edited out the

2    name of the company.

3            And finally, Your Honor, I would add it is possible

4    that the defendant has access to weapons.  Exhibit 19 in the

5    government's memorandum is a photo of Mr. Fairlamb and several

6    automatic weapons.  He'd holding them in a garage.  I don't

7    know whose guns these are.  In preparation for this hearing I

8    reviewed the search warrant photos, and I don't think that

9    photo was taken in the defendant's garage.  So I don't know

10   whose guns those are, I don't know if those are his.

11           I will note he was interviewed seven days before he

12   was arrested and when the FBI arrived there were no automatic

13   weapons, but there were two shell casings.

14           So for all of those reasons, we would also submit

15   that the danger to community factor weighs heavily in favor of

16   detention.

17           Now, there are several cases that are applicable

18   here.  Of course, the Court of Appeals opinion in *U.S. v.*

19   *Munchel* is the most important.  And in that case the Court has

20   directed us to look at whether or not the defendant poses a

21   concrete, prospective threat.  Or said differently, is an

22   identified and articulable threat to the individual or the

23   community.  And we submit that Mr. Fairlamb is.  This is not

24   the same fact pattern as *United States versus Munchel*.

25           In *United States versus Munchel* the Court

1  specifically noted that Munchel did not physically harm anyone

2  or enter the Capitol by force.  The same cannot be said for

3  Mr. Fairlamb.  He is on video shoving and punching a uniformed

4  MPD officer in full view of other police.  He was also part of

5  the crowd that successfully overran the policemen's metal

6  barricades outside of the Capitol building.

7        So by the very terms of its opinion, we submit Mr.

8  Fairlamb is quite distinguishable from *Munchel*.  And I'll also

9  note that the Court of Appeals itself noted in *Munchel* that

10  this threat need not be of physical violence and may extend to

11  nonphysical harm, such as corrupting a union.  And here

12  Mr. Fairlamb's subscription to the QAnon conspiracy theory, his

13  apparent willingness to go again or to engage in war is very

14  relevant to the possibility of corrupting a union because he

15  may well -- there is certainly evidence to conclude -- engage

16  in something like this in the future.

17        Finally on *U.S.A versus Munchel*, I will note the text

18  of the opinion read, "In our view those who actually assaulted

19  police officers and broke through windows are in a different

20  category of dangerousness."  And that, Your Honor, is the

21  defendant in this case.

22        The Court asked us to take a look at the *Federico*

23  *Klein* opinion that was recently issued by Judge Bates.  In that

24  case Mr. Klein, although he's been charged with assaulting a

25  police officer, he was not detained.  And I would point out

1   there are several distinguishing factors between these two

2   cases.  Mr. Klein's assault was described as pressing a stolen

3   riot shield against bodies and shields of police officers.  But

4   Judge Bates concluded that his objective in that action was not

5   to harm a police officer, but to advance the mob's position.

6   Judge Sullivan agreed in a recent case, *U.S. v. Sabol*, where he

7   described Klein as engaging in forceful conduct that was not

8   directed towards inflicting injury.

9       But, Your Honor, there is no way that one could view

10  Exhibit 12, showing the defendant shoving and punching an MPD

11  officer, and not conclude that his intention was to injure

12  somebody.  As it happens, he did not injure the officer, but

13  certainly that was his intent.  He was not trying to move

14  forward, he was not trying to advance the actions of the mob.

15  He was simply just assaulting a police officer.

16      And, secondly, Klein had no criminal history.  And he

17  also held a -- very recently had held a top secret security

18  clearance at State Department.  Whereas Mr. Fairlamb has, in

19  our view, a significant violent criminal history.  So for those

20  reasons we believe that the *Klein* case is distinguishable.

21      And just one more case, Your Honor.  In defense

22  counsel's submission he cited two of the six *Chrestman* factors.

23  Some of the Courts in this District who are looking at Capitol

24  riot detention issues have found it persuasive to consider the

25  *Chrestman* factors, which come from our detention order by the

1    Chief Judge.  We would merely submit that although the

2    defendant cited to two of them, the vast majority of these

3    factors actually weigh heavily in favor of detention.

4           The first factor being whether the defendant was

5    charged with felonies.  Here he was.

6           The second factor being prior planning.  It's not

7    exactly clear at this point how much prior planning there was,

8    but we do know that the defendant posted, "How far are you

9    willing to go?  Put up or shut up" on his way to the Capitol.

10          The third factor is whether the defendant used or

11   carried a dangerous weapon.  He did.  A police baton.

12          Fourth is corrupt coordination with other protesters,

13   which he did coordinate, very much so, with the large crowd

14   that overran the metal barricades and first intruded into, and

15   breached, really, the Capitol interior.

16          The fifth is a leadership role.  And we concede that

17   at this point there is no evidence that he played a leadership

18   role in the riot.

19          And the sixth factor, the most important pressing

20   factor, are his words and movement during the riot.  And that's

21   ultimately what we would ask the Court to look at.  Look at his

22   words:  Screaming his intention to disarm the police and to

23   storm the Capitol, screaming his intention not to leave.  And

24   look at his actions and his violent, unprovoked assault against

25   an MPD officer.

1         And for all of these reasons we submit that there is

2    clear and convincing evidence that the defendant poses a

3    concrete, prospective threat to the community and there is no

4    condition or combination that will assure the safety of the

5    community.  We would ask the Court to hold him pending trial.

6         THE COURT:  All right.  Mr. Bright, you can respond.

7         MR. BREITE:  Thank you, Your Honor.  I'll try to be

8    very brief.  It's interesting to note that my client is quoted

9    as saying, quote, We ain't f-ing leaving, but then the

10   government acknowledges, quote, he leaves just a couple minutes

11   later.  So, again, a lot of this is puffery, it's hyperbole,

12   it's braggadocio, it's hypermasculinity.  It's just

13   something -- some of it, some of it is words, it's bragging,

14   it's excessive -- it's posturing.  It's posturing.  Screaming

15   at police is not illegal.  It may not be polite, it may not be

16   courteous, but it's not a crime to scream at police.

17        This country has seen thousands and thousands of

18   people screaming at police in various public demonstrations

19   where people have assembled and things have gotten out of hand,

20   completely unrelated to the issues that, unfortunately,

21   occurred on January 6th at the Capitol.  But screaming at the

22   police itself is not illegal.  It's not polite, again, but it's

23   not illegal.

24        When my client says, "How far are you willing to go

25   to defend our Constitution?" he's clearly talking about his

1    willingness just to travel the distance from New Jersey to D.C.

2    He doesn't follow that up with Are you willing to shoot

3    somebody? Are you willing to drop a bomb?  He says, "How far

4    are you willing to go?" meaning the travel, are you willing to

5    go down to D.C. and stand there and espouse an opinion.  Which,

6    all of that is lawful.  And of course, he didn't steal a

7    laptop.  No one is saying that.

8            But, Judge, the distinction that the government makes

9    with *Klein*, that my client committed something worse than did

10   the defendant in *Klein* because my client committed an assault,

11   *Klein*, according to the government, quote, advanced a mob's

12   position.  My client committed what is routinely, according to

13   the government, committed what is routinely referred to as a

14   simple assault.

15           Now, I'm not trying to diminish the serious nature of

16   even a simple assault.  But advancing an entire mob, as did

17   Klein, is much more serious and much more dangerous than a

18   single simple assault would be.

19           To promote a conspiracy theory, Judge, that's not a

20   crime in and of itself.  The government's arguing he promoted

21   these theories, the free flow and expression of ideas, even the

22   most unpopular of ideas, even the most repugnant of ideas is

23   permissible in this country based upon our Constitution.  And,

24   Judge, if the government found -- if the government believed

25   that my client was so dangerous, why would the FBI have waited

1    eight days to arrest him?  They knew where he was, they spoke

2    to him, and they waited eight days to arrest him.  Surely

3    somebody so dangerous, with an articulable, identifiable

4    threat, somebody who fits that description, the FBI, with the

5    prodigious resources, would not wait eight days to go arrest

6    that type of dangerous person.  They would have arrested him

7    right away.

8            And in closing, Judge, I don't think that Your Honor,

9    respectfully, should give much weight to anything said by

10   anonymous tipsters.  It's not a video, it's not something --

11   it's just words from an anonymous person.

12           And, lastly, Judge, my client doesn't own any

13   weapons.  It's not illegal for him to, at that time, have taken

14   a photo of him holding two rifles.  It's merely inflammatory to

15   introduce that.  They checked his house, they searched his

16   house, he doesn't have any weapons.  He -- there's no record of

17   him having a weapon that he's concealing.  There are no weapons

18   that my client has, nor will he have access to should the Court

19   release him.  Thank you.

20           THE COURT:  All right.  I'll issue a memorandum

21   opinion later this afternoon.  I will say, in a brief

22   statement, that the first -- I probably do not agree with the

23   holding in *Klein*.  In any event, I do think that the law as set

24   forth in *Munchel* is that those who actually assaulted police

25   officers are in a different category of dangerousness.  And I

1    think that *Munchel* would support, and I will find, it

2    authorizes this Court to find that the defendant is in a

3    category that authorizes, and I will authorize, that he be held

4    without bond pending trial.

5         I think that with his criminal history and the facts

6    in this case, that the evidence supports that the magistrate's

7    ruling here was incorrect and that the government's motion to

8    hold him without bond pending trial will be granted.

9         I'll issue written findings and conclusions to

10   support that, so that there's an adequate record for that to be

11   reviewable by the Court of Appeals, if they disagree.  But I

12   think that is consistent with what the Court of Appeals

13   actually did find in *Munchel.*  And I don't think it's actually

14   inconsistent with *Klein*.  It probably -- particularly in light

15   of his prior criminal history and in light of the violent way

16   in which he assaulted the police officer here, and his

17   possession of the baton, which is a violent act itself, the

18   dangerous weapon.

19        I guess the only other thing we need to do today is

20   talk about -- I presume the government is going to try to agree

21   on a protective order so we can start turning over some of

22   these tapes and other materials to the defendant --

23        MS. GOEMAAT:  Your Honor --

24        THE COURT:  -- talk about what kind of a schedule we

25   can set.  Tell me about it.

1          MS. GOEMAAT:  Yes, Your Honor.  I'm sorry for

2     interrupting you.  I believe the Court has already entered a

3     stipulated protective order in this case, and I have already

4     produced approximately 2800 items in informal discovery.  And

5     the vast bulk of those items come from a Facebook and Instagram

6     search warrant.  But I have produced all of the items that were

7     discussed today.  And the bulk of these specific case files --

8     the difficulty, as with all of these cases, is not going to be

9     in finishing discovery of our case file, which is already

10    underway -- I'm hopeful to get formal discovery out, I would

11    say, realistically, in the next 30 days -- but the bigger

12    issue, as in all of these cases, is to manage and review and

13    identify all of the many, many thousands of hours of video and

14    photos and hundreds of thousands of citizen tips to be sure

15    that we've identified and produced all of the material that the

16    FBI and U.S. Attorney's Office has collected that would be

17    discoverable in this case.

18          So the immediate case file, discovery of that case

19    file is well under way.  We've made good progress.  The Court

20    has entered both orders that we've asked the Court to enter, I

21    believe.  But, what we have, we're going to have great

22    difficulty in making sure that all of the videos, pictures and

23    tips have been properly produced.

24          So, I didn't have an opportunity to talk to

25    Mr. Bright about scheduling this morning.  But I'll also add,

1    with respect to discovery, we have a filter problem.  The phone

2    that was seized from Mr. Bright in review has paused so that we

3    can engage in a filter review.  I have -- Mr. Breite and I plan

4    to talk later about whether or not the filter can be waived or

5    whether additional information about, for example, names of

6    lawyers and such can be provided to expedite the filter review.

7    But that's also a process that needs to be completed.

8            So for those reasons we would ask for -- well,

9    anytime to set a schedule.  But I would ask the Court to set 60

10   days for completion of discovery, and to enter a speedy trial

11   order under ends of justice because of the incredibly

12   unbelievable, voluminous amount of evidence that was collected

13   in this investigation, to allow us to make headway on that.

14   And, unfortunately, I neglected to ask for an order from April

15   13th to April 23rd.  That was on the defendant's own motion to

16   continue while there was a pending detention motion.  But we

17   also do need a speedy trial order for that period of time.

18           THE COURT:  So, you're proposing we come back the

19   23rd of June?

20           MS. GOEMAAT:  Yes, Your Honor.  I think we should set

21   it for -- if you'll give me a moment to look at my calendar.  I

22   think if we set it for -- I would actually -- yes, the -- if we

23   set it for the 23rd of June for a status, I think -- hopeful

24   that the formal -- discovery from the -- this particular case

25   file will be completed by then and I should have a much more

1    thorough and accurate report for the Court as to how much of

2    the broader material we've reviewed and how much more time we

3    need to do that.  And that will give Mr. Breite and my office

4    time to talk about possible resolution and then, otherwise,

5    scheduling.

6              THE COURTROOM DEPUTY:  Your Honor, this is the

7    courtroom deputy, Ms. Bell-Norwood.  The week of the 23rd --

8    well, the whole week of the 21st is open with D.C. jail, as

9    well.

10             THE COURT:  Okay.  I have some other hearings on the

11   morning of the 23rd.  We could do it at 2 p.m. on the 23rd, if

12   that works for the defendant.  Mr. Breite?

13             MR. BREITE:  Yes, sir, whatever time the Court

14   wishes.

15             THE COURT:  Let's try for 2 p.m. on the 23rd.  Now,

16   did -- was the defendant arraigned here?  Has he been

17   arraigned?

18             MS. GOEMAAT:  Yes, Your Honor.  He was arraigned on

19   April 13th.

20             THE COURT:  Okay.  All right.  And is there any

21   objection, Mr. Breite, to the defendant's waiving speedy trial

22   until June 23rd?

23             MR. BREITE:  No, judge.  The defense is not going to

24   make those objections.  We recognize that the government has a

25   massive amount of discovery to --

1          THE COURT:  And it may be to your advantage to get

2     some of those other tapes, I don't know.  But I assume you may

3     want them, in any event.

4          MR. BREITE:  Yes.  Yes.  Although videotape has not

5     always been proven effective for the defense.  But, yes, Judge,

6     it's going to be a gathering process for both the government

7     and the defense.  We want to just put out right now that we're

8     not going to press the government on strict time tables for the

9     production of discovery.  In fact, U.S. attorneys have been

10    very, very gracious with their time and their courtesies to me,

11    and I hope to extend that in return.

12         So, I just want them to know, if for some reason

13    there's a deadline and something happens, the defense is not

14    going to stand up and jump and scream and shout.  We, too, are

15    going to be in sort of an investigatory mode, trying to get

16    what we can.  And, of course, we will turn it over as per

17    *Brady*.  And there are some -- there are some procedural things

18    still going on in this case, which both the Court and the

19    government have been very patient.  We appreciate that.  We're,

20    hopefully, coming to a close on some of the procedural aspects.

21         But I do hope that I can speak with the U.S.

22    attorneys as this case -- in the near future regarding this

23    matter.

24         THE COURT:  Okay.  Is there anything else you want to

25    raise today?  As I said, I'll issue written findings and

1    conclusions about the detention, of course.

2              THE COURTROOM DEPUTY:  Judge Lamberth, are you dating

3    speedy trial back -- I'm sorry, this is the courtroom deputy.

4    Speedy trial back to April 13?

5              THE COURT:  Yes, because we had a defense motion

6    anyway.  So it will go back to April 13th.

7              THE COURTROOM DEPUTY:  Okay.  Thank you.

8              THE COURT:  And go to June 23rd.

9              THE COURTROOM DEPUTY:  Yes, sir.

10             THE COURT:  I find it's in the interest of justice.

11   It's really in the interest of the defendant, too, to get

12   everything -- it may be in his interest to find all the

13   information that could be in his interest as well.  So, it's in

14   the interest of justice to waive speedy trial until then.

15             I also think -- and a good lawyer knows this, so

16   obviously Mr. Breite knows this -- that until the government

17   really figures out what -- where we are in cases like this,

18   plea offers are not going to be favorable to the defendant, and

19   the likelihood of a good plea offer right now is not as good as

20   it's going to be with a little more time.  They haven't made

21   any to anybody, except cooperators, yet.  And the time for it

22   is not yet.

23             So, the good lawyers, like Mr. Breite, already

24   recognize where we are in that process.  So, I understand,

25   Mr. Breite.  I appreciate that.

1          MR. BREITE:  Thank you.

2          THE COURT:  I've had to say that to a couple of

3    lawyers who were chomping at the bit.  And said, you know, good

4    lawyers know what's going on here, and lawyers who aren't so

5    experienced don't know.  It appears Mr. Breite knows.

6          MR. BREITE:  It's very difficult, Your Honor,

7    sometimes to explain that.  While defendants have a right to a

8    speedy trial --

9          THE COURT:  Defendants don't have the experience to

10   know that, I understand.

11         MR. BREITE:  Mr. Fairlamb understands that both sides

12   are working as expeditiously as they can and these matters take

13   time.  And while I'm absolutely sure he's very disappointed

14   today, still understands that this is a process and we -- both

15   sides will be working towards possible resolution at a time

16   that's more ripe for the government and the defense.

17         THE COURT:  Good.  Okay.  Anything else either side

18   wants to raise today?

19         MS. GOEMAAT:  Nothing from the government, Your

20   Honor.

21         MR. BREITE:  Nothing from the defense.

22         THE COURT:  Okay.  Thank you very much, Counsel.

23   Court will be in recess.

24         MS. GOEMAAT:  Thank you, Your Honor.

25         THE COURTROOM DEPUTY:  This Honorable Court is

1    adjourned.

2                              *   *   *

3

4              CERTIFICATE OF OFFICIAL COURT REPORTER

5

6        I, JANICE DICKMAN, do hereby certify that the above and

7    foregoing constitutes a true and accurate transcript of my

8    stenographic notes and is a full, true and complete transcript

9    of the proceedings to the best of my ability.

10                        Dated this 2nd day of April, 2021

11

12

13                        _____

14                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
15                        Room 6523
                          333 Constitution Avenue, N.W.
16                        Washington, D.C.  20001

17

18

19

20

21

22

23

24

25