**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-120-RCL** |
| **SCOTT KEVIN FAIRLAMB,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Scott Fairlamb to forty-four months' incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment for each count of conviction.

## I.     INTRODUCTION

The defendant, Scott Fairlamb, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Fairlamb, a former Mixed Martial Arts ("MMA") fighter, joined the storming of the police line on the West Terrace, obtaining a police baton, and screaming "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol!" Fairlamb then brandished that same police baton while entering the U.S. Capitol through the Senate Wing Door, which had been kicked out

1

by rioters who entered through a broken window, just one minute before Fairlamb's entry. After exiting the U.S. Capitol, Fairlamb aggressively followed a line of dramatically out-numbered Metropolitan Police Department ("MPD") officers, screaming vitriol at them as they attempted to traverse the over-run Terrace. After isolating an MPD officer from his fellow officers, Fairlamb shoved the officer and then punched his face shield. Two days after the riot, on January 8, Fairlamb filmed a chilling video threatening future violence, stating, "*they pulled the pin on the grenade, and the blackout is coming. What a time to be a patriot,*" and, immediately after being visited by FBI agents on January 15, 2021, said that he would "go again" to the U.S. Capitol.

The government recommends that the Court sentence Fairlamb to 44 months' incarceration, which is within the advisory Guidelines' range of 41-51 months, which the government submits is the correct Guidelines calculation. A 44-month sentence reflects the gravity of Fairlamb's conduct, but also acknowledges his early admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Fairlamb among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See*

*United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started out calmly enough. As set forth in the PSR and the Statement of Offense incorporated into Fairlamb's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate,

including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-9; PSR ¶¶ 18-24.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol

Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of nearly $1.5 million.

**B.       Defendant's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

Scott Fairlamb, a one-time MMA fighter[1] and gym owner, participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn camera from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol.

Fairlamb traveled to Washington, D.C. from his home in New Jersey in the very early hours of January 6. He first joined a large group of people who had gathered at the Lincoln Memorial. From there, he made his way to the "Stop the Steal" rally and thereafter to the U.S. Capitol where he took a photo with a U.S. Capitol Police sign that read "AREA CLOSED," while he smiled and gestured with his middle finger towards the camera.



---

[1] *See* SCOTT FAIRLAMB, "WILDMAN," *available at* https://www.sherdog.com/fighter/Scott-Fairlamb-70989 (last visited October 14, 2021).

### *Fairlamb Ascends the Scaffolding*

Fairlamb then approached the Capitol Building and scaled the northwest scaffolding on Capitol grounds. *See* Exhibit 1. The scaffolding was located at the western face of the Capitol building. The following is a still image from Exhibit 1. Fairlamb is circled in red.



*Video Still from Exhibit 1*

Fairlamb took a video from that same scaffolding, which he posted to Instagram.[2] This video is submitted to the Court as Exhibit 2. In Exhibit 2, Fairlamb can be seen on the same scaffolding at the Capitol and heard screaming "We ain't fucking leaving either! We ain't fucking leaving!" The following are still images from Exhibit 2:

---

[2] This video was provided via a tip to the FBI. A search warrant executed on Fairlamb's Instagram page did not recover this video, suggesting that Fairlamb deleted it prior to service of the preservation request.





*Still from Exhibit 2*                    *Still from Exhibit 2*

***Breach of the Police Line and Obtaining the Police Baton***

Several minutes later, video footage captures a large group of rioters pressing past police attempting to hold the line at the top of the Northwest stairway on the Capitol's Upper West Terrace. Rioters can be seen overwhelming the outnumbered police and successfully breaking through metal barricades as shown in the following video still:



Approximately 18 seconds later, after the skirmish line was breached, Fairlamb can be seen crossing the former line and picking up a baton and putting it under his arm.



*Fairlamb picking up Police Baton*



*Fairlamb with Baton*

After obtaining the baton, Fairlamb recorded another video,[3] Exhibit 3, this one posted on

---

[3] This video was also submitted via a tip to the FBI tip. A search warrant executed on Fairlamb's Facebook account did not recover this video, suggesting that Fairlamb also deleted the video prior

Facebook, where Fairlamb can be seen brandishing the collapsible baton outside of the Capitol and yelling: "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol!"



*Still from Exhibit 3*

to service of the preservation letter.

Fairlamb then took a "selfie" with that same collapsible police baton:



*"Selfie" taken by Fairlamb*

Fairlamb later admitted that the police were firing pepper balls into the crowd.[4] Far from

deterred, Fairlamb apparently found this amusing, taking a "selfie" with an undetonated pepper

ball in his mouth.

---

[4] Fairlamb participated in an interview with the FBI and the U.S. Attorney's Office on September 30th per the terms of his plea agreement. *See* Plea Agreement ¶ 2.

11



*"Selfie" taken with Pepper Ball*

***Breach of the Capitol Building and Fairlamb's Entry into the Capitol***

After the encounter with the Capitol Police Officers, Fairlamb joined the large crowd forcing their way into the Capitol Building. Surveillance video, Exhibit 4, from inside of the Capitol Building shows rioters smashing and entering through windows in the Capitol. Those rioters then kick open a locked door to the Capitol, allowing in a stream of rioters.



*Still from Exhibit 4, 42 seconds prior to Fairlamb's entry, showing rioters entering through adjacent window*

At approximately 2:14 PM, less than one minute after the Capitol Building was breached through the window, Scott Fairlamb entered through the Senate Wing Door brandishing the police baton.



*Still from Exhibit 4*

Shortly thereafter, members of the Senate and the House of Representatives were forced to evacuate. *See supra.* Several minutes after entering the Capitol Building, Fairlamb exited against the incoming stream of rioters by way of the same door through which he entered.



*Still from Exhibit 4*

### U.S. Capitol Police Encounter

At approximately 2:25 PM, ten minutes after exiting the Capitol Building, Fairlamb encountered several U.S. Capitol Police officers who were attempting to prevent rioters from entering through the Parliamentarian door.



*Fairlamb speaking to U.S. Capitol Police Officers at Parliamentarian Door*

In his September 30th interview, Fairlamb claimed that he was offering these officers water and that he then offered to help them leave that area. The officers were not wearing body worn camera, but they were interviewed about this encounter. One officer told the FBI that a man offered them water and offered to help them get out of the area and that that man led them around the building towards the north door so that they could get into the building. The officer also told the FBI that the man told other people to leave the officers alone. A second officer recalled a man

walking with them as they left the area, and also recalled the man attempting to diffuse the situation and telling protestors to leave the officers alone. A third officer recalled a white man who walked with them as they left the area and stated that the man's presence was not helpful as they walked away on their own. A fourth officer had no recollection of the events described above.

A video from a third party seems to corroborate Fairlamb's claim as it shows Fairlamb at the head of a line of five U.S. Capitol Police officers. Exterior camera footage from the U.S. Capitol also corroborates Fairlamb's claim that he lead the officers around the corner.



*Video still showing Fairlamb appearing to lead a line of Capitol Police officers*

### *Assault of Metropolitan Police Department Officer*

At 2:47 PM, approximately 20 minutes after encountering the U.S. Capitol Police officers, the defendant assaulted an MPD officer. The defendant was video-taped following and harassing a line of MPD officers who were attempting to make their way through the thick crowd of rioters to join a larger group of officers. As Fairlamb hurled vitriol at these officers, he shoved and then punched Officer Z.B. in the face. A bystander captured these events on video.[5]  A portion of this video will be submitted to the Court as Exhibit 5. As the Court will see, the defendant follows a line of MPD Officers and aggressively screams at them, "Are you an American? Act like a fucking one! . . . You guys have no idea what the fuck you're doing!"



*Still from Exhibit 5*

The defendant continues to scream at the line of MPD officers and inserts himself into the middle of their line, cutting off MPD Officer Z.B. The officer attempts to move Fairlamb out of

---

[5]  The full high-resolution video is available at https://capitol-hill-riots.s3.us-east-1.wasabisys.com/Miscellaneous%20-%20Other%20people%27s%20archives/1-6-2021%20archive%20akansomi/Cop%20Vs%20The%20American%20People%21%21.mp4  (last accessed November 3, 2021). The defendant can be seen from 3:25 to 4:00 in the full video.

the way, but the defendant responds by shoving Officer Z.B. so hard that he falls into a line of watching rioters. Fairlamb sticks his finger in Officer Z.B.'s face, and when Officer Z.B. pushes the defendant's hand aside, the defendant swiftly punches Officer Z.B.'s face shield. The violence and speed of the assault is captured in Exhibit 5.

Body worn camera of another officer captures the defendant following the line of MPD officers while aggressively screaming "you have no idea what the fuck you're doing[.]" That video will be submitted to the Court as Exhibit 6.

At :27s in Exhibit 5, the defendant can be seen shoving Officer Z.B.:



*Still from Exhibit 5*

At :31s in Exhibit 5, the defendant punches Officer Z.B.'s face shield.



*Still from Exhibit 5*

A clip from Officer Z.B.'s body worn camera footage captures the assault from Officer Z.B.'s perspective and depicts the defendant, cutting between the MPD Officers and in front of Officer Z.B prior to the assault. The following is a still from Officer Z.B.'s body worn camera:



*Still from Officer Z.B.'s body worn camera*

*Defendant's Statements*

The United States obtained search warrants for Fairlamb's Facebook and Instagram accounts. A review of the recovered material revealed that Fairlamb appeared to subscribe to the QAnon conspiracy theory, that he traveled to Washington, D.C. prepared to commit violence, and that in the days following January 6, he had no remorse for the events that occurred.

On January 5, 2021 at 2:37 PM, prior to traveling to D.C., Fairlamb re-posted another Facebook user's post which pictured a tweet with a Steve Bannon quote, "All hell is going to break loose tomorrow[,]" and the other user's caption, "I'm here in DC and it's nothing but Trump supporters everywhere. Let's roll, Patriots #fightForTrump #FightFor America[.]"



On January 6, 2021 at 6:43 AM, the defendant posted to Facebook, "*How far are you willing to go to defend our Constitution*? Made the trip solo, looking to meet my fellow Patriots who share the same beliefs. *Put up or shut up*." (emphasis added). In the aftermath of the riot of January 6, moreover, Fairlamb alternately lied about and glorified the events of that day. The day

after the riot, for example, he blamed the breach of the Capitol on "Antifa" and falsely stated that

he left the moment the doors were breached, posting on Facebook:

> What started out yesterday as an incredible showing of support and patriotism
> ended with complete and utter disrespect/disappointment. At the snap of a finger
> NON patriots (Antifa dressed as Trump supporters) literally broke down the
> doors to the Capitol building after violently clashing with police. Not myself nor
> anyone I know sees this to be of any value to our cause or ideals. While very
> passionate about my beliefs I know right from wrong and can identify who and
> what we are up against, it was and is still not the men and women that were
> there to protect our Capitol. It's the elected officials we put inside. I appreciate
> everyone reaching out concerned for my safety. I left the moment I saw the
> doors being breached and never looked back.

The next day, January 8, 2021, in an apparent reference to the theft of Speaker Pelosi's

laptop on January 6, Fairlamb boasted in an Instagram message, "Wiener Biden Pelosi all laptops

in our possession[.]" On the same day, he also, recorded a video of himself,[6] Exhibit 7, where he

stated "Ah, censoring our President. Bad idea. *They pulled the pin on the grenade, and the blackout*

*is coming. What a time to be a patriot*."

The government's review of Fairlamb's Instagram and Facebook accounts revealed that,

even after January 6, he subscribed to the theory that former President Trump would become the

first President of the new Republic beginning March 4. On January 9, 2021, in response to this

assertion, another Instagram user asked Fairlamb, "But what will happen with all these unhinged

liberals if this happens[?]" Fairlamb replied, "War Vs patriots" and "They don't want that lol[.]"

Fairlamb then stated, "It's go time" and "Q said this word for word[.]"

---

[6] Seized from the defendant's cell phone.

On January 15, 2021, the FBI attempted to interview Fairlamb about his participation in the riot. On that day, he messaged an Instagram user, "Came here" [because] "People reported seeing me at the Capitol[,]" an apparent reference to the FBI's attempt to interview Fairlamb on that day. Fairlamb then told the user, "All good[,]" and "*I'd go again*" (emphasis added).



In addition to social media statements made after the riot, the defendant has a history of violent rhetoric. On January 10, 2021, the FBI received an anonymous tip stating: "Scott Fairlamb

has a history of violent threats and did participate in Stop the Steal Rally. Unfortunately he deleted all social media accounts after riots." The tipster then provided the following Instagram post from Fairlamb's Instagram account, @FairlambFit, directed at Congresswoman Cori Bush. The post states "@coribush You're full of shit, shoulda lit your ass up" and promotes other violent and threatening posts directed at Congresswoman Bush, including "I wish someone would put a knee on your neck for spreading lies. #whitelivesmatter," "your words are going to bring you a harvest very soon," and "Lock n load America. When they defund they [sic] police you shoot back."



### Destruction of Evidence

The United States has been unable to locate either Exhibit 2 (Instagram video from scaffolding) or Exhibit 3 (Facebook video with baton) in the Facebook or Instagram search warrant returns or on Fairlamb's seized cell phone. This is consistent with citizen tips submitted to the FBI that stated that the inculpatory videos had since been deleted from Facebook. During his interview with the government, Fairlamb denied destroying evidence. That denial is inconsistent with the evidence suggesting that Fairlamb destroyed evidence after the riot. Fairlamb provided no

explanation for the missing content.

### *Injuries*

Although Officer Z.B., the assault victim in this case, reported that he did not suffer any physical injuries, the defendant's participation in this riot aided those rioters who did succeed in injuring officers and destroying property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attach") *supra.* His violent conduct served to incite and embolden other violent rioters around him.

## III.    THE CHARGES AND PLEA AGREEMENT

On April 7, a federal grand jury returned a superseding indictment charging the defendant with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Entering or Remaining in any Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Impeding Ingress and Egress in a Restricted Building or grounds in violation of 18 U.S.C. § 1752(a)(3), Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), Impeding Passage Through the Capitol Grounds and Buildings in violation of 40 U.S.C. § 5104(e)(2)(E), Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F), Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G), and Stepping, Climbing, Removing, or Injuring Property on the Capitol Grounds in violation of 40 U.S.C. § 5104(d).

On August 6, the defendant pled guilty to Count Two, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), and Count Three, Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

## IV.     STATUTORY PENALTIES

The defendant now faces sentencing on Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2) and Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Obstruction of an Official Proceeding.

As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Three, Assaulting, Resisting, or Impeding Certain Officers.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The revised PSR includes two errors. First, the revised PSR does not include a Guidelines analysis for both Counts—Counts Two and Three—to which the defendant pleaded guilty. *See* PSR ¶¶ 35-51. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶ 39) that Counts Two and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis follows:

Count Two: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[7] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[8] | +3 |
| | **Total** | **25** |

[7] As described in the government's objections to the draft PSR, the government submits that U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

[8] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Fairlamb admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and nearly $1.5 million in property destruction. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

Count Three: 18 U.S.C. § 111(a)(1)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a)[9] | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |

| | |
|---|---|
| **Combined Offense Level** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **22** |

*See* Plea Agreement at ¶¶ 5(A).[10]

The revised PSR's second error is to include an official victim enhancement under U.S.S.G. § 3A1.2(a) for the offense level calculation for Count Two. *See* PSR ¶ 44. The PSR correctly concludes that because the Counts group, Count Two, which has the higher base offense level, provides the base offense level for the grouped Counts. *See* PSR ¶ 39 (citing U.S.S.G. § 3D1.3(a)). As noted above, Count Three, which reflects the assault on Officer Z.B., includes a six-level victim enhancement under U.S.S.G. 3A1.2(b). Unlike the assault reflected in Count Three, however, obstruction of Congress as reflected in Count Two has no individual victim; the victim of obstruction in Count Two is Congress, *i.e.*, the government. But the government does not qualify as a victim for purposes of the victim enhancement in U.S.S.G. § 3A1.2(a). *See* U.S.S.G. § 3A1.2 cmt. n. 1 (victim enhancement applies "when specified individuals" are victims, but "does not

---

[9] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[10] Based on the facts and circumstances of Fairlamb's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 41-51 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

apply when the only victim is an organization, agency, or the government").[11]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 56. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 22, Fairlamb's Guidelines imprisonment range is 41 to 51 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its

---

[11] The PSR prepared on October 6 did not include separate Guidelines analyses for Counts Two and Three and proposed a six-level enhancement for an official victim under U.S.S.G. § 3A1.2(b). Following the government's objections, the revised PSR removed the six-level enhancement, but added a three-level enhancement under U.S.S.G. § 3A1.2(a).

very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration. Fairlamb's statements prior to the riot demonstrate that he was prepared for violence. Upon arriving at Washington, D.C., Fairlamb posted on social media, "How

far are you willing to go to defend our Constitution? . . . Put up or shut up."

Upon approaching the Capitol, Fairlamb unlawfully scaled the northwest scaffolding. While there, he incited the mob and violence, screaming at the top of his lungs, "We ain't fucking leaving either! We ain't fucking leaving!" *See* Exhibit 2. Completely undeterred by views of rioters fighting police and pepper balls flying through the air, Fairlamb descended the scaffolding and crossed a breached police line, obtaining a collapsible police baton in the process. On his way into the Capitol, again surrounded by rioters, he continued to incite the mob to violence, waving the police baton and yelling, "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol!" *See* Exhibit 3.

Fairlamb was then one of the first rioters to breach the U.S. Capitol, having entered less than 30 seconds after the Senate Wing Door was kicked open by rioters who had just smashed through the adjacent window with a stolen riot shield and climbed through the window. When the defendant entered the U.S. Capitol, he did so brandishing a weapon. *See* Exhibit 4.

After exiting the Capitol, the defendant followed and harassed a line of dramatically out-numbered police officers, shouting "Are you an American? Act like a fucking one! . . . You guys have no idea what the fuck you're doing!" at them and blocking their progress through the crowd of hundreds of rioters. He then cut off Officer Z.B. from the line of MPD officers and violently shoved him and punched his face shield. *See* Exhibits 5 and 6. As a former MMA fighter, the defendant was well aware of the injury he could have inflicted on Officer Z.B.

The defendant's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to incite and engage in violence. By his own words, he intended to "disarm them and then [] storm the fucking Capitol!" *See* Exhibit 3. Fairlamb had no intention of leaving,

30

as evinced by his screams of "We ain't fucking leaving either! We ain't fucking leaving!" *See* Exhibit 2. His actions show a willingness to violate the law, to engage in acts of disorder and violence, and to harm others, including uniformed law enforcement. *See* Exhibit 5.

After the riot, Fairlamb appears to have celebrated the actions of the rioters, showing no remorse or contrition in his social media postings. Fairlamb celebrated and endorsed the theft of Speaker Pelosi's laptop, writing "Wiener Biden Pelosi all laptops in *our* possession[.]" (emphasis added). He then created a video with a chilling threat after former President Trump was removed from social media, stating "Ah, censoring our President. Bad idea. *They pulled the pin on the grenade, and the blackout is coming. What a time to be a patriot.*" *See* Exhibit 7 (Emphasis added). He then appears to be girding for war, claiming an impending "War Vs patriots" and stating, "It's go time[.]" Finally, and most importantly, he said the he would "go again" to the Capitol, immediately after being visited by FBI agents investigating his participation in the riot. *See* "Defendant's Statements" *supra.* These statements demonstrate a total lack of remorse in the days following the attack on the Capitol and a genuine danger of future violence from this defendant.

Although Fairlamb denied deleting videos during his interview with the government, the evidence clearly demonstrates that he did as Exhibits 2 and 3 – Instagram and Facebook videos provided to the FBI through its tip line – were neither found on his seized cell phone or his seized Instagram and Facebook accounts.

Pursuant to the terms of his plea agreement, Fairlamb engaged in a multi-hour debrief with the U.S. Attorney's Office and FBI prior to his sentencing. During his interview, Fairlamb expressed remorse. He stated that he felt great shame over his conduct on January 6. He expressed that if given the opportunity he would sincerely apologize to the victim officer. Fairlamb expressed

that he had been duped by the social media that he had consumed prior to the riot and was deeply regretful for his conduct on January 6.

Those post-plea sentiments, while laudable, stand in absolute and stark contrast to Fairlamb's statements made on social media after the riot. He recorded a video on January 8 where he stated, "[t]hey pulled the pin on the grenade, and the blackout is coming. What a time to be a patriot." *See* Exhibit 7. On January 9, he told an Instagram user that it would be "War Vs patriots" and that it was "go time." *See supra*. Most importantly, on January 15, the defendant told an Instagram user, "I would go again[,]" after being questioned by the FBI about his participation in the riot.

While Fairlamb may have attempted to assist a group of officers at one point, he proceeded to then assault another police officer verbally and physically. The seriousness of this offense including the defendant's incitement of the mob violence, entry into the U.S. Capitol during the initial breach while brandishing a weapon, and assault on a uniformed police officer, demands a lengthy sentence of imprisonment.

### B.  The History and Characteristics of the Defendant

The defendant is a former MMA fighter who owned and operated a gym in Pompton Lakes, New Jersey until his arrest. PSR ¶ 96. The defendant has a significant and violent history of arrest and conviction which weighs in favor of a lengthy period of incarceration:

- In 2002, the defendant was charged with Aggravated Assault by Attempting to Cause Serious Bodily Injury. The case was "no billed." PSR ¶ 58.

- In 2006, the defendant was charged with and pleaded guilty to unlawful possession of a handgun. He was sentenced to two years' probation. PSR ¶ 53.

- In December 2008, the defendant was charged with aggravated assault and robbery. The case was dismissed. In this case, it was alleged that the defendant

punched a victim in the left eye during the theft of a home entertainment system. ¶ 59.

- On April 3, 2009, the defendant was charged with and pleaded guilty to aggravated assault in Passaic County, New Jersey. In that case, the police were called after a bar fight erupted at a bar where Fairlamb served as a bouncer. A complainant stated that he was punched several times in the face by the bouncer, Scott Fairlamb. The defendant was sentenced to 3 years' probation. PSR ¶ 54.

- In April 2018, the defendant was charged with Aggravated Assault. In that case, the complainant told police that he was smoking outside of a bar when he was punched by an unknown male in the throat and then struck several more times while on the ground by Mr. Fairlamb and at least two additional unknown males. The complainant stated he suffered several broken ribs and provided documentation of rib injuries. The assault was recorded on the bar's surveillance video and the complainant later identified Mr. Fairlamb out of a line-up. Mr. Fairlamb pleaded guilty to simple assault. No information is available about his sentence. PSR ¶ 55.

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a long series of violent offenses. The defendant's criminal history demonstrates a propensity towards violence that is concerning, particularly in light of his "wonderful" and supportive childhood in a law enforcement family. *See* PSR ¶¶ 64, 66. Further, according to a tip to the FBI, the defendant has a history of violent threats, including previously posted threatening language directed at Representative Cori Bush. *See supra.* The defendant's history and characteristics including his history of arrest and conviction for violent assaults and history of violent rhetoric weighs heavily in favor of a lengthy term of incarceration.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly

Case 1:21-cr-00120-RCL   Document 50   Filed 11/03/21   Page 34 of 41

administration of the democratic process."[12] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Fairlamb's criminal conduct, assaulting a law enforcement officer and corruptly obstructing of an official proceeding, is the epitome of disrespect for the law. When Fairlamb entered the Capitol grounds, the Capitol itself, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.     The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[12] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor

---

[13] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, although the defendant has a criminal history category of I, his history of arrest and conviction shows a clear pattern of assaultive behavior. *See* Section VI(B) *supra.* Second, although the defendant has now expressed remorse and contrition, his social media statements after January 6 were those of a man girding for another battle. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Fairlamb's own statements that he would "go again [to the U.S. Capitol]" and that by censoring President Trump, they have "pulled the pin on the grenade, and the blackout is coming" demonstrates that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of violent assault and rhetoric.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, only one felony Capitol Riot defendant has been sentenced – *United States v. Paul Hodgkins*, 21-cr-118-RDM. Hodgkins unlawfully entered the U.S. Capitol and made it to the Senate Floor with a Trump flag. There, the United States requested 18 months' imprisonment and Hodgkins was sentenced to 8 months' imprisonment. Hodgkins was the first defendant to be sentenced for a violation of Section 1512(c)(2), having taken very early responsibility for his actions, and he neither committed nor incited violence on January 6. The facts here are dramatically different. Fairlamb armed himself with a police baton and incited violence outside of the Capitol. He was one of the very first rioters inside of the Capitol, and he entered the Capitol brandishing a weapon. Finally, Fairlamb's violent assault on a police officer during January 6 demands a significantly lengthier sentence. Accordingly, the instant recommendation does not constitute an unwarranted sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[14] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer Z.B., did not suffer bodily injury as a result of Fairlamb's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Fairlamb must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Fairlamb played in the riot on January 6.[15] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the

---

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Architect of the Capitol in mid-May 2021. *Id.* Fairlamb's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.

## VIII.   FINE

Fairlamb's convictions under Sections 111 and 1512 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the revised PSR notes, Fairlamb has raised over $30,000 in an online campaign styled as a "Patriot Relief Fund." PSR ¶ 108a. The website indicates the funds are to be used for mortgage payments, medical insurance, attorney fees, and monthly bills. *Id.* Fairlamb should not be able to "capitalize" on his participation in the Capitol breach in this way.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 44 months, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, a fine, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


BY:   _Leslie a. Goemaat_
      LESLIE A. GOEMAAT
      MA Bar No. 676695
      Assistant United States Attorney
      Fraud Section
      U.S. Attorney's Office
      555 4th Street, N.W., Room 5840
      Washington, D.C. 20530
      Office: 202-803-1608
      Leslie.Goemaat@usdoj.gov

      /s/ Gauri Gopal
      GAURI GOPAL
      Assistant United States Attorney
      MA Bar No. 676695
      555 4th Street, N.W.,
      Washington, D.C. 20530
      Office: 202-252-7230
      Gauri.Gopal@usdoj.gov

41