# THE LAW OFFICE OF HARLEY D. BREITE
562 Black Oak Ridge Road
Wayne, N.J. 07470

Phone- 973-872-0604                          Fax- 973-305-9112
Member - N.Y., N.J., PA & DC Bar     LL.M. (Master of Laws) in Trial Advocacy

November 8, 2021

Hon. Royce C. Lamberth
United States District Judge
United States District Courthouse
333 Constitution Avenue NW
Washington, D.C. 20001

*Let this be filed.*
*Royce C. Lamberth*
*U.S.D.J. 11/8/21*

Re: United States of America vs. Scott Kevin Fairlamb
    Case No. 21-cr-120-RCL

## DEFENDANT'S SENTENCING MEMORANDUM

Dear Judge Lamberth,

I respectfully request that Your Honor consider this submission on behalf of my client, Scott Kevin Fairlamb, in connection with his Sentencing Hearing scheduled for Wednesday, November 10, 2021 at 10:30 am.

For the reasons set forth herein, the Defense requests that the Court sentence Scott Fairlamb to eleven months incarceration, essentially a time-served sentence, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment for each count of conviction. Should the Court disagree with this position, we would request, in the alternative, a sentence to take into consideration the approximate 11 months the Defendant has already served in custody and order an additional six month sentence of home detention with electronic monitoring at the cost of the Defendant.

## PROCEDURAL HISTORY

On January 22, 2021, the Defendant was peacefully arrested at his home in New Jersey without incident on an arrest warrant issued from the United States District Court for the District of Columbia by Magistrate Judge Robin M. Meriweather.

On January 22, 2021, the Defendant appeared in the United States District Court for the District of New Jersey for his Initial Appearance. During that appearance, the Government made a motion to detain the Defendant without bond pending trial. Subsequent to oral argument, U.S. Magistrate Judge James B. Clark III denied the Government's motion for detention and released the Defendant. Immediately thereafter, the Government requested a stay of the

1

Defendant's release in order to appeal the Court's decision.  Judge Clark granted the Government's request.  On that same day, the Government filed a Motion for Emergency Stay and Review and appeal of a Release Order (ECF No. 7) and a Motion for Transport Order (ECF N0. 8).  On that same day, Chief Judge Beryl A. Howell granted the Government's Motion for Emergency Stay and Review (ECF No. 9) and the Motion for Transport (ECF No. 10).

On April 7, 2021, a superseding indictment was returned in the District of Columbia charging the Defendant with the following crimes:

1. Civil Disorder in violation of Title 18, U.S.C., Section 231(a)(3).
2. Obstruction of an Official Proceeding and Aiding and Abetting in violation of Title 18, U.S.C., Section 1512(c)(2) and 2).
3. Assaulting, Resisting, or Impeding Certain Officers in violation of Title 18, U.S.C., Section 111(a)(1).
4. Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of Title 18 U.S.C., Section 1752(a)(1) and (b)(1)(A).
5. Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of Title U.S.C., Section 1752(a)(2).
6. Impeding Ingress and Egress in a Restricted Building on Grounds in violation of Title 18 U.S.C., Section 1752(a)(3).
7. Engaging in Physical Violence in a Restricted Building or Grounds in violation of Title 18 U.S.C., Section 1752(a)(4).
8. Disorderly Conduct in a Capitol Building in violation of Title 40 U.S.C., Section 5104(e)(2)(D).
9. Impeding Passage Through the Capitol Grounds or Buildings in violation of Title 40 U.S.C., Section 5104(e)(2)(E).
10. Act of Physical Violence in the Capitol Grounds or Buildings in violation of Title 40 U.S.C., Section 5104(e)(2)(F)
11. Parading, Demonstrating, or Picketing in a Capitol Building in violation of Title 40 U.S.C., Section 5104(e)(2)(G).
12. Stepping, Climbing, Removing, or Injuring Property on the Capitol Grounds in violation of Title 40 U.S.C., Section 5104(d).

On April 23, 2021, Your Honor conducted a Detention Hearing and ordered the Defendant detained.

On August 6, 2021, the Defendant pled guilty to Count Two, Obstruction of an Official Proceeding in violation of 18 U.S.C. Section 1512(c)(2), and Count Three, Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. Section 111(a)(1).

The Presentence Investigation Report produces a United States Sentencing Guidelines ("Guidelines") totaled adjusted offense level of 25 for Count Two: 18 U.S.C. Section 1512(c)(2) and a total adjusted offense level of 22 for Count Three: 18 U.S.C. Section 111(a)(l).  The U.S. Probation Office, the Government and the Defense agree that the Defendant's criminal history is Category 1.  Given the Defendant's total adjusted offense level of 22, including the Defendant's acceptance of responsibility, the Guidelines suggest a custodial

sentence ranging from 41 to 51 months.   The Plea Agreement calls for an agreement on the calculation of this range but permits the Defense to argue for a downward variance based upon the factors set forth in 18 U.S.C. Section 3553(a).

### A.  Nature and Circumstances of the Offense

The January 6, 2021 attack on the U.S. Capitol was inarguably a criminal manifestation of the political divide of the United States of America.   However, the Defense respectfully disagrees with the Government's assertion that, as a criminal offense, it is "unparalleled in American history."   This country, founded upon the principles that a corrupt government is no government at all, stands for the premise that the citizenry is ultimately entrusted to ensure that democracy prevails.   The American Revolution was just that and through this country's entire history, political demonstration, often violent in nature, has marked important epochs in the growth of this country.   And while that in no way is meant to condone the actions of my client on January 6, 2021, there is however, a long history of recognizing the need for forgiveness towards those who transgress the law while protesting federal authority.   It was then President George Washington himself who pardoned the only two men found guilty of treason in The Whiskey Rebellion of 1794.

The Government's Sentencing Memorandum ("GSM"), in suggesting a fair and just sentence, selects what they call "a number of critical factors" (GSM-page 29).   I will attempt to address them in anticipation of the Government's argument during the Sentencing.

**1) Whether, When, How the Defendant Entered the Capitol Building**: The Defendant quickly accepted responsibility for his actions and fully admitted that he did, in fact, enter the Capitol.   As to the issue of when he breached the Capitol, he certainly was not the first person to do so.   When the Defendant scaled the northwest scaffolding he was not the first to do so and he was also not alone on the scaffolding.   The Defendant did not throw anything at anyone nor did he inflict any physical harm onto another while on the scaffolding.   The Government notes in their Memo that the Defendant entered the Capitol "after the Senate Wing Door was kicked open by rioters who had just smashed through the adjacent window with a stolen riot shield and climbed through the window."   I would ask the Court to consider that the Defendant was not part of any action that kicked open doors or shattered windows in order to gain entry.   The Defendant walked right in, with others, without harming a single person.   The Court may also consider that the Defendant did not go to the Capitol bearing any weapon whatsoever.   The Defendant found the collapsible police baton after he arrived at the Capitol and never once used the baton to inflict pain upon anyone. This clearly demonstrates that when Mr. Fairlamb left New Jersey that same morning for Washington, D.C., he had no intent to commit violence upon any person.

3

Chief Judge Howell enumerated specific considerations to differentiate the severity of the behavior amongst the hundreds of defendants affiliated with the January 6, 2021 events at the Capitol. See United States v. Chrestman, - - F. Supp. 3d – 2021 WL 765662, at *7 (D.D.C. Feb 26, 2021) (Howell, C.J.). The second of those considerations is whether the defendant "engaged in prior planning before arriving at the Capitol." Here, it is clear that Mr. Fairlamb, acting alone, arrived by himself at the Capitol unarmed and without any premeditation to commit any violence.

### 2) Whether the Defendant Engaged In Violence or Incited Violence:
Other than an initial plea of not guilty, there has been no dispute that Mr. Fairlamb engaged in violence by striking Metropolitan Police Officer Z.B. in the face shield. Government Exhibit 5, which has been played for the entire world by agents of the Press and social media outlets, clearly demonstrates this altercation. Thankfully, Officer Z.B. was not seriously injured.

### 3) Whether the Defendant Engaged in Any Acts of Destruction:
There appears no evidence that the Defendant engaged in any acts of destruction.

### 4) The Defendant's Reaction To Acts of Violence or Destruction:
Here, the Government is asking the Court to engage in speculation rather than draw reasonable inferences. Unless one were to take a substantial step to commit a crime, merely expressing one's reaction to anything, including acts of violence or destruction committed by others, is not a crime. In fact, one could argue the First Amendment protects any such expression. One could wonder as to why so much of these "Capitol Riot" cases focus on political ideology. The fact is that people died and others were seriously injured. More important than which lever one pulls inside a voting booth is the attention we should now pay in assessing just how far one can assemble, speak out and actually act out. What a person says is very often quite different from what a person does or is even willing to do. The Government would like this Court to examine all of the Defendant's social media rants, video clips and photographs compiled for the most part by people who have never even met Mr. Fairlamb. To subscribe, with any certainty, the intent of a person from just one video or photo or excerpt from social media is to suggest that we can actually know and predict future behavior from that one quick image or statement. The Court is should little to no weight to any of those extraneous exhibits offered by the Government.

### 5) Whether During or After the Riot, the Defendant Destroyed Evidence:
Clearly, the Defendant did not destroy any evidence or he would have been accordingly charged with a crime. Mr. Fairlamb never once obstructed justice as evidenced by his polite engagement with the FBI when they first came to his home. Later, when the FBI returned to arrest him, the Defendant's peaceful and completely compliant surrender was not associated with any claim

whatsoever that at any time prior to his arrest, he had destroyed any evidence. Removing oneself from social media at anytime, does not constitute destroying evidence as those materials were previously published to the entire world.

**6) The Length of the Defendant's Time Inside the Building and Exactly Where He Traveled:**

The Government Sentencing Memorandum states, "Several minutes after entering the Capitol Building, Fairlamb exited against the incoming stream of rioters by way of the same door through which he entered" (GSM- page 14). Consequently, there can be no dispute that Mr. Fairlamb never harmed anyone nor sought to harm anyone once inside the Capitol Building. In fact, he ignored the crowd, turned back and exited against the surging mass of protestors. Video clearly shows that Mr. Fairlamb was not roaming around attempting to encounter any elected officials or cause any physical harm to persons or property. The collapsible baton was never used against anyone or anything insider or outside of the Capitol Building.

**7) The Defendant's Statements In Person or On Social Media:**

The Government raises a very sensitive issue in asking this Court to punish the Defendant for unpopular speech. This is not the time nor place to exhaustively argue the First Amendment. The Defense asks Your Honor to ignore excited and exaggerated boasts and political positions expressed by Mr. Fairlamb and judge him by his past history and what he did that day, January 6, 2021. What the Defendant may have said or displayed on social media neither harmed anyone or amounted to a crime so it should not be given any weight in the Court's decision in sentencing the Defendant.

**8) Whether Defendant Cooperated With or Ignored Law Enforcement:**

Without doubt, the most unique and perplexing aspect of this particular case is the Defendant's 2:25 pm encounter with the U.S. Capitol Police, which is captured on video. Perhaps this is an appropriate place to recognize that Assistant United States Attorney Leslie Goemaat and Assistant United States Attorney Gauri Gopal have been two of the most decent, honest, and transparent prosecutors with whom I have ever dealt during my 28 years as an attorney. It was AUSA Goemaat and AUSA Gopal who somehow found this incredible video and provided it to the Defense. The public should be made aware that regardless of which side they fall on in terms of political belief, they can be sure that the Government and the Court have done nothing but elevate the status and integrity of our criminal justice system.

The Government, in their own Sentencing Memorandum, provided numerous photos accompanied by an honest description of the Defendant actually assisting U.S. Capitol Police Officers (GSM- pages 14-16). Mr. Fairlamb encountered several U.S. Capitol Police Officers who were struggling to prevent rioters from gaining entry through the Parliamentarian door. First offering the officers water and then helping to extricate them to safety, Mr. Fairlamb was actually enlisting himself as part of the solution, not the problem. Although the

5

officers were not equipped with body cameras, they were interviewed by the Government and corroborated everything the Defendant said during his FBI debriefing as part of the plea agreement. One officer recalled that a man offered he and the other officers water and then that man led all the officers around the building towards the north door in order to get the officers safely into the building. This officer told the FBI that this person also told other people to leave the officers alone. A second officer told of a man walking with them as they left the dangerous area. He also said that this man attempted to diffuse the dangerous situation by telling rioters to leave these officers alone. The Government produced a video from a third party corroborating the Defendant's account and demonstrating Mr. Fairlamb leading a line of 5 U.S. Capitol Police Officers. There is yet another video from the U.S. Capitol showing Mr. Fairlamb leading the officers around the corner.

And then we are to deal with Mr. Fairlamb, just 22 minutes after the aforementioned events, punching Metropolitan Police Department Officer Z.B. in the face shield. Government Exhibit 5 is a portion of this incident being captured on video. Mr. Fairlamb is seen clearly upset with the manner in which he perceives the Metropolitan Police are dealing with the protestors. When Officer Z.B. attempted to physically move the Defendant, the Defendant shoved Officer Z.B. out of line. When Officer Z.B. pushed the Defendant's hand aside from his face, Defendant responded by punching Officer Z.B. in his face shield.

Footnote 6 on page 13 of the Government's Memorandum Seeking Detention read "Officer Z.B. reported to the FBI that he did not sustain injury or seek medical attention."

There can be little said in defense of a civilian striking a law enforcement officer. But of course, there are degrees in each and every incident that allow us to fairly and without the infusion of emotion, evaluate and determine the level of transgression and the true amount of harm caused. Terms such as provocation and justification are often used in attempt to ameliorate crimes but in the end, as is the case here, there is simply no legally permissible reason to do what the Defendant did. The Defendant realizes this as is evident by his desire to quickly assume responsibility for his actions and begin down the road proving to himself, his family and friends, that he is no longer in any part, the person seen in those troubling videos.

**9) Whether the Defendant Exhibited Evidence of Remorse or Contrition:**

On September 30, 2021, the Defendant met with the U.S. Attorney's Office and the FBI for a debrief. The remorse expressed by Mr. Fairlamb was unquestionably sincere. He expressed the tremendous shame he brought onto himself and his family. In a completely unsolicited manner, Mr. Fairlamb continually demonstrated genuine contrition for causing harm to Officer Z.B. and said that if it were possible, he wished to personally apologize. Everyone in the room plainly saw the gratitude upon Mr. Fairlamb's face when told that his apology would be relayed to the officer. In response to a very specific question, the Defendant earnestly expressed that he did, in fact, feel as if he had been

duped by social media prior to January 6, 2021.  It is important to recognize that Mr. Fairlamb was not transferring any blame or responsibility onto the media, but rather, honestly answering the question put to him by the Government.  Just as it should not be difficult for anyone today to believe that a person could be informationally- manipulated by media outlets, it should also not be difficult to believe that such a person can undergo a change of heart in their belief systems.  The Government, in stating "Those post-plea sentiments, while laudable, stand in absolute and stark contrast to Fairlamb's statements made on social media after the riot" (GSM- page 32) appears to somehow be able to dictate and know just how long it takes any person to realize that they have been mislead.  Epiphanies are rare but it certainly didn't take Mr. Fairlamb long to realize that his previous line of thinking was incorrect.  It certainly didn't take Mr. Fairlamb long to feel remorse and regret.  Just as all people mourn differently, those who come to see and actually feel the error of their way, don't all do so in the same manner or with the same rapidity.  There are in fact, limits to any government's omnipotence and it may begin with not being able to absolutely know the minds and hearts of its citizens, despite some suggestive and conflicting outward appearances.

### B.  The History and Characteristics of the Defendant

The Government is intent on reminding the Court that the Defendant is a "former MMA fighter" (GSM- page 32).  Mr. Fairlamb fought exactly one (1) time as an MMA fighter in 2010 and lost that match.  Twenty-one years later, after just one fight, the title "former MMA fighter" while technically accurate, is a bit misleading.

The Government goes on to list the Defendant's criminal history in detail while just casually mentioning, almost as an aside, that 2 of the 5 listed matters resulted in a dismissal.  If the Government is not willing to prosecute a person after charging him, then they should not enjoy the benefit of having it be given any weight in this Court's consideration as to a just sentence.

Perhaps the Defendant's most serious past criminal matter occurred in 2006 and resulted in a non-custodial sentence.

With regard to the 2018 matter that resulted in a guilty plea to a disorderly persons offense (sometimes referred to as a misdemeanor) and only a small fine, I represented the Defendant on that matter and am thus fully familiar with the facts, proofs and disposition of that case.  The Complainant in that matter, drunk at a bar, attempted to provoke the Defendant's friend by calling him a "Nigger." Mr. Fairlamb took umbrage to the use of such slur and was subsequently punched by the Complainant.  Having been the winner of the ensuing fight, it was routine in Passaic County that Mr. Fairlamb would be criminally charged.  The Government is correct in that the incident was captured by the bar's surveillance video but the verbal denigration of Mr. Fairlamb's friend was not.

## Confinement in the Washington, D.C. Jail

On or about March 16, 2021, the Defendant was transferred from the Hudson County Jail in New Jersey to the Washington, D.C. Jail (DC Jail). Despite the DC Jail knowing that while incarcerated, Defendant on January 27, 2021, suffered a heart attack, it did nothing to assist his recovery. The Defendant was confined to his cell but for thirty (30) minutes per day. The dietary conditions in the DC Jail are simply deplorable as to both the caloric quantity and quality of what is provided to inmates. This, coupled with the medically documented fact that the Defendant is a Leukemia survivor who takes medication and is under the care of multiple physicians, served only to exacerbate Defendant's medical condition.

The Defendant is housed in an area particular to only those charged in the "Capitol Riot" case. This intentional segregation impedes any critical reflection and ability to introspect. How can any such inmate question the assumptions that led him to any criminal action on January 6, 2021 when continuously surrounded by those refusing to acknowledge any wrongdoing? Incarceration is not meant to be a holiday but the denial of one's pre-trial liberty is not a license to violate any prisoner's civil rights. The DC Jail is more reminiscent of Solzhenitsyn's "One Day in the Life of Ivan Denisovich" than it is of any remotely acceptable American penal institution. It is so utterly shameful and far reaching that Your Honor saw fit, for other reasons, to hold both the Director of the City's Department of Corrections and the Warden of the DC Jail in contempt of court.

Mr. Fairlamb, as a result of participating in a nightly routine of singing "G-d Bless America" along with all the Capitol Riot inmates, was then repeatedly threatened by an Officer Holmes who entered the Defendant's cell leaving two guards outside with their back turned. Officer Holmes then proceeded to tell Mr. Fairlamb, "I am going to kick your ass." Mr. Fairlamb immediately wrote and submitted a complaint, which was met with another visit from Officer Holmes who once again threatened Mr. Fairlamb with violence.

I have practiced criminal defense as an attorney throughout this entire country and have never seen such a blatant disregard for inmates' rights as I have seen from this DC Jail. The countless hours I fought through DC Jail bureaucracy simply to be told how I could forward Discovery to my client was nothing more than a veiled attempt to thwart and discourage inmates from receiving the proofs in their own cases. When I finally learned of the DC Jail's requirements and fully complied, the flash drive of Discovery I provided was returned to me without so much as a single note or letter as to why it was not given to my client. To this day, I cannot obtain an answer as to why that Discovery was returned to me in such a derelict fashion.

There is a well-documented history of the DC Jail hindering attorney/client visits as well as refusing the Capitol Riot inmates the same privileges as other inmates to email their attorneys and families. The entire world but for the DC Jail has found Zoom and other electronic applications to provide video visits in the face of the COVID-19 pandemic.

In September 2021, Mr. Fairlamb, through me, was asked by Senior Investigative Counsel Sean P. Tonolli if he would be willing to speak with the Select Committee to Investigate the January 6th Attack on the United States Capitol.   Mr. Fairlamb, without hesitation agreed.    When the Defendant was advised that the U.S. Attorney's Office would take no position on his cooperation with the Committee and not offer him any credit, he did not waiver and still insisted on assisting the Committee.   But of course, the DC Jail would not allow the U.S. House of Representatives permission to come inside the jail and interview the Defendant along with counsel.   In fact, the DC Jail has done nothing but impede my ability to even receive an answer as to how such a meeting could be conducted.   My client, formerly part of the problem, now clearly demonstrates that he wishes to be part of the solution but once again, the DC Jail can't get out of its own way to foster and promote wellness and progress.

## Defendant's Background

In assessing Mr. Fairlamb's history and characteristics for purposes of sentencing, the Court could look at some of the previously established criteria used during detention hearings.   The Court, under its own discretion, consider the Defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history and record concerning appearance at court proceedings." 18 U.S.C. Section 3142(g)(3)(A).

Scott Fairlamb is 44 years old and has lived in New Jersey his entire life.

On Mother's Day, 2012, his parents, while riding a motorcycle, were struck by a car in a head on collision that took the life of his father, Preston Fairlamb. The Defendant's father was a New Jersey State Trooper.   As a result of that accident, his mother, Kathleen Fairlamb, underwent twenty-six surgeries and has become handicapped.   She lives in Haskell, New Jersey, close to the Defendant who prior to his incarceration, cared for her throughout the week.

The Defendant's brother, Preston Fairlamb, is currently a federal law enforcement agent with the United States Secret Service.   Given the surrounding circumstances of this case, the Defendant has not communicated with his brother in an effort to ensure the integrity of all parties and to ameliorate any pressure or uneasiness his arrest has caused his brother.   The Defendant's sister, Kimberly Fairlamb, lives close to the Defendant and they have an excellent relationship.

On September 21, 2019, the Defendant wed Andrea Fairlamb, formerly Andrea Castro.

Prior to his arrest, the Defendant owned and operated his own gym/training facility, "Fairlamb Fit" since January 22, 2016, located in Pompton Lakes, New Jersey.   There was no staff and no payroll because he personally trained the members and ensured the operation and maintenance of the gym himself.   His incarceration was a massive detriment to the membership and the sustainability of the gym itself.   Without his presence, membership diminished at a significant rate and the operating costs remained unpaid.   The Defendant's

landlord was forced to take possession of the premises. Soon thereafter, the gym closed. This situation placed Mrs. Fairlamb in serious financial peril with regard to maintain mortgage payments on the family's recently purchased home. The Defendant's actions on January 6, 2021 have had led to tremendously difficult financial times for Mrs. Fairlamb who has had to rely on family and friends providing loans.

Prior to owning and operating a gym, the Defendant was a security guard at Stevens Institute of Technology in Hoboken, New Jersey. He also graduated from the Essex County Sheriff's Department Program, a law enforcement-training program.

The Defendant was diagnosed with Leukemia on October 10, 2010 and underwent aggressive treatments with protracted stays in the hospital. He is still required to take daily medication and remains under the care of Dr. Mohammed Cherry at the Carol G. Simon Cancer Center in Morristown, New Jersey. Mr. Fairlamb is required to have monthly visits and evaluations with Dr. Cherry.

While detained at the Hudson County Jail, on this matter, Mr. Fairlamb suffered a heart attack on January 27, 2021. During his incarceration, the Defendant has been precluding from performing recommended daily therapeutic physical activity as well as benefiting from fresh outdoor air. His doctors recommend that he return to work and perform regular exercise.

Arresting agents confirmed that at the time of his arrest, Mr. Fairlamb was compliant. A search of the residence did not provide any weapons other than 2 shotgun shells and a bow/crossbow that the Defendant uses for hunting only animals that he will eat. Mr. Fairlamb does not own a single firearm.

Just as Mr. Fairlamb made boasts related to his then held political beliefs but never had any intention to bring them to fruition, so was the same when he boasted he would open his gym in defiance of the New Jersey governor's stay-at-home orders. Mr. Fairlamb never opened his gym in defiance of the Governor's order. There is often quite a distance between mere words and actual action.

Any assertion that my client traveled to the Capitol prepared to commit violence is unfounded. There is no evidence that my client had any plan or that he took premeditated steps to commit violence at the Capitol. My client did not travel with nor bring any weapon to the Capitol. He found a baton on the floor. There is no evidence that he struck or attempted to strike anyone with a baton. My client never once sought to conceal his identity. If intent to commit a crime may be inferred from one concealing their identity, then the fact that my client never once concealed his face or the uniquely identifying tattoo on his hand should be used to infer that my client lacked any intent to violate any law. The Defendant took no steps in anticipation of any violence to be committed against Congress.

The Defendant never held or assumed a leadership role in the attack on the Capitol. There is no evidence that Mr. Fairlamb coordinated with other demonstrators before, during, or subsequent to the riot, or assumed any meaningful leadership role during the riot. Anything Mr. Fairlamb may have said on January 6, 2021 or shortly thereafter may have been repugnant but certainly

does not demonstrate that Mr. Fairlamb was a de facto leader of others that day. No leadership role can be attributed to Mr. Fairlamb even if some of his actions are seen as occasionally working with the mob and even contributing to their overall efforts given their spontaneous and unanticipated nature.

During the life of these Capitol Riot cases, Judge Bates in an April 12, 2021 detention hearing opinion differentiated between defendants who assaulted officers and engaged in planning activities and those defendants who assaulted police officers but did not engage in planning activities. The later, Judge Bates noted, in several cases, were released without objection from the government (United States of America v. Federico Guillermo Klein, (Crim. No. 21-236 (JDB)). Following that line of thinking, Mr. Fairlamb can be seen as deserving of more leniency in his sentence from the Court than perhaps others who committed an assault upon a police officer.

Mr. Fairlamb poses no continued articulable threat to anyone or the community. He has demonstrated sincere remorse as well as a willingness to become part of the remedy to the problems that contributed to the events of January 6, 2021.

If the Defendant were to receive essentially a time-served sentence, he could return home to a job now waiting, offered by a friend in which the Defendant would earn $50,000.00 per year and be entitled to health insurance for he and his wife. Given all that the Defendant's health has endured subsequent to his arrest, this health insurance benefit is of dire need to the Fairlamb family.

The Defendant, if released, could also fulfill his desire to be interviewed by the Select Committee to Investigate the January 6th Attack on the United States Capitol.

Mr. Fairlamb, if released, could also continue some of the charity work in which he was involved prior to his arrest. In the winter of 2020, Mr. Fairlamb self-organized a clothing drive to provide proper attire to those less fortunate than himself. Mr. Fairlamb filled a van with clothes and delivered them to a food shelter in Paterson, New Jersey and then personally entered Lou Costello Park, also in Paterson, in order to hand deliver winter coats to the homeless.

The Court may also take into consideration that the Defendant has been incarcerated during the course of the ongoing COVID-19 pandemic. The Court is certainly aware of the extremely difficult and anxiety-causing conditions experienced by inmates during the pandemic, such as extreme periods of lockdown and isolation, inability to properly social distance and practically complete elimination of in-person social and legal visits. The Court is asked to consider Mr. Fairlamb's incarceration during the COVID-19 pandemic as a factor justifying a downward variance.

As of November 8, 2021, the Defendant will have served almost 10 months in jail. Factoring in 15% good time credit to which he would be entitled as well as the fact that he would be entitled to 6 months of halfway house time he has already served the equivalent of an 18 month sentence (10 x 1.15 = 11.5 months + 6 months halfway house = 17.5 months).

It is clear that Mr. Fairlamb is not a danger to the community.   Mr. Fairlamb has most definitely learned the error of his ways and understands what led him to make such poor decisions surrounding the events of January 6, 2021. He is sincerely remorseful and will never repeat the crimes to which he pled guilty.  Mr. Fairlamb has a family ready to provide strong support for his return as a law-abiding and productive member of society.

Based upon the factors and arguments set forth above, Mr. Fairlamb most respectfully implores the Court to sentence him to time served.  A time served sentence would require a downward variance of 24 months from the sentencing guideline range of 41 months.

Respectfully submitted,

Harley D. Breite, Esq.

cc: AUSA Leslie A. Goemaat
    AUSA Gauri Gopal